**THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| POARCH BAND OF CREEK INDIANS, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 20-CV-438 |
| MCKESSON CORPORATION; | ) | |
| AND DOES 1-100 | ) | (Removed from the Circuit Court of |
| | ) | Mobile County, 02-CV-2020-901671.00) |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1331, 1441, 1446, and 1367, Defendant McKesson Corporation ("McKesson") hereby gives timely notice of the removal of this matter from the Circuit Court of Mobile County, Alabama, to this Court. As grounds for removal, McKesson states as follows:

**I.     INTRODUCTION**

1.     "[A] cornerstone of the Tribe's theory of recovery in this case is that defendants should pay the Tribe for monetary losses incurred in providing medical care and treatment for citizens with opioid-related conditions." *Poarch Band of Creek Indians v. Amneal Pharm., LLC*, 2020 WL 3833009, at *1 (S.D. Ala. July 8, 2020). Because a significant portion—if not a majority—of those costs are ultimately borne by the federal government pursuant to a comprehensive funding and regulatory regime governed by federal law, the Tribe's Complaint necessarily raises substantial threshold federal issues that must be litigated in federal court.

2.     This action is one of thousands of related lawsuits filed against manufacturers and distributors of FDA-approved prescription opioid medications relating to alleged harms stemming from abuse of opioid medications. On December 5, 2017, the Judicial Panel on Multidistrict Litigation (JPML) formed a multidistrict litigation (MDL) and transferred opioid-related actions to Judge Dan Aaron Polster in the Northern District of Ohio pursuant to 28 U.S.C. § 1407. *See In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375 (J.P.M.L. 2017). In creating the opiate MDL, the JPML found "common questions of fact" among actions where, as here, plaintiffs "allege that: (1) manufacturers of prescription opioid medications overstated the benefits and downplayed the risks of the use of their opioids and aggressively marketed (directly and through key opinion leaders) these drugs to physicians, and/or (2) distributors failed to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates." *Id*. at 1378. The JPML also determined that "centralization will substantially reduce the risk of duplicative discovery, minimize the possibility of inconsistent pretrial obligations, and prevent conflicting rulings on pretrial motions. Centralization will also allow a single transferee judge to coordinate with numerous cases pending in state courts." *Id.* at 1379*.* To date, more than 2,800 actions have been transferred to the opiate MDL.

3.     On August 6, 2020, the JPML found that another action filed by the Tribe alleging substantially similar claims against manufacturers and distributors of prescription opioids and removed to another court in this district "involve[d] common questions of fact with the actions previously transferred to MDL No. 2804, and that transfer under 28 U.S.C. § 1407 will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." *See* Transfer Order, *Poarch Band of Creek Indians v. Amneal Pharmaceuticals, et al.*, No. 1:20-cv-00279-WS-B (S.D. Ala.), ECF No. 42.

2

4.     In staying that action to permit its transfer to the opiate MDL, Judge Steele concluded that the Tribe's complaint necessarily raised issues of standing requiring the "examination and application of the federal statutory and regulatory regime for Indian health care, which may in turn be sufficient to trigger the 'substantial federal issue' basis for federal question jurisdiction . . . ." *Poarch Band of Creek Indians*, 2020 WL 3833009, at *5. Because "identical or similar jurisdictional issues" to those presented by the Tribe's claims in that case were "currently pending in MDL No. 2804," Judge Steele determined that a stay would "enabl[e] the transferee court to decide the jurisdictional issues presented here in tandem with adjudication of the same issues raised in other cases that the transferee court must decide anyway." *Id.* at *6.

5.     This case is identical in every material respect, and pursuant to 28 U.S.C. § 1331, likewise belongs in federal court—specifically, in the opiate MDL—where it will join over 100 other opioid-related actions filed by Indian tribes and tribal entities.

## II.     <u>NATURE OF REMOVED ACTION</u>

6.     On August 5, 2020, the Poarch Band of Creek Indians ("Plaintiff" or "the Tribe") filed this action in the Circuit Court of Mobile County, State of Alabama, titled *Poarch Band of Creek Indians v. McKesson Corp., et al*. The court designated the case No. 02-CV-2020-901671.00.

7.     On September 3, 2020, McKesson moved for an enlargement of time to respond to the Complaint through October 26, 2020. The motion was granted by the Circuit Court of Mobile County on September 4, 2020.

8.     McKesson has not responded to the Complaint in state or federal court.

9.     Like plaintiffs in hundreds of actions transferred to and consolidated in the opiate MDL, the Tribe alleges that McKesson failed to report and halt suspicious orders of prescription

opioids. (Compl. ¶¶ 31-39.) The Complaint asserts six causes of action: (1) negligence; (2) nuisance; (3) unjust enrichment; (4) fraud and deceit; (5) wantonness; and (6) a violation of the Alabama Deceptive Trade Practices Act. (*Id.* ¶¶ 221-302).

10.     The Tribe is a federally recognized Indian tribe. (*Id.* ¶ 1.)  Among other things, the Tribe seeks to recover costs purportedly incurred in providing healthcare to their members as a result of opioid medication abuse. *See, e.g.*, Compl ¶ 62 ("The Tribe has incurred significant costs in an attempt to abate the opioid epidemic that continues to plague the Tribe's citizens by providing medical services and opioid-related treatments to those in need. The Tribe brings this suit, in part, to recover these costs and procure the additional financial resources required to adequately combat and abate opioid addiction, opioid-related injuries, and other problems caused by the opioid crisis."); *id*. ¶ 241 (seeking compensatory and punitive damages for "injury related to the diagnosis and treatment of opioid-related conditions" and "massive costs [incurred] by providing uncompensated care as a result of opioid-related conditions").

11.     As explained below, the federal government, pursuant to a comprehensive and well-established federal scheme, provides funding to the Tribe for the provision of healthcare services to their members, and the Tribe's claims squarely and necessarily implicate that scheme.

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 on two independent grounds. *First*, the Tribe's claims present an issue of federal law that is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.[1] *Grable & Sons Metal*

---

[1] This Court recently denied motions to stay and remanded two opioid cases removed to the Southern District of Alabama on the basis of federal question jurisdiction. *See* Order, *Mobile County Board of Health et al. v. Richard Sackler et al.*, Case No. 1:19-cv-01007-KD-B, ECF No. 33 (Jan. 15, 2020); Order, *DCH Health Care Authority, et al. v. Purdue Pharma L.P., et*

*Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). *Second*, to the extent the Tribe can pursue common law claims outside the statutory right-of-action provisions contained within the federal scheme, any non-statutory claim necessarily would be one under federal common law. *See United States v. Standard Oil Co. of Cal.*, 332 U.S. 301 (1947) (federal rule of decision required for claims seeking recovery of federally-funded health care costs from third-party tortfeasors); *see also Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 850 (1985) (concluding claims "founded upon federal common law," including principles of Indian law arising under federal common law, give rise to jurisdiction under 28 U.S.C. § 1331).

## III.   THIS COURT HAS SUBJECT MATTER JURISDICTION UNDER 28 U.S.C. § 1331 BECAUSE THE TRIBE'S CLAIMS NECESSARILY RAISE A DISPUTED AND SUBSTANTIAL ISSUE OF FEDERAL LAW

13.     Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. While the Tribe's claims are ostensibly pleaded under state law, the U.S. Supreme Court has held that an action can still "arise under" federal law regardless of the manner in which the claims are pled. "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see also Grable*, 545 U.S. at 314 (same).

---

*al.*, 1:19-cv-00756-WS-C, ECF No. 41 (Dec. 3, 2019). The federal question implicated in *DCH* and *Mobile County*, however, related to duties under the Controlled Substances Act, 21 U.S.C. § 801 *et seq. See id.* The federal question at issue in this case concerns a comprehensive federal framework for the provision of healthcare to tribal peoples that is entirely unrelated to the federal question raised in *DCH* and *Mobile County*, such that those cases do not apply or control.

14.     "Where all four of these requirements are met . . . jurisdiction is proper because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Gunn*, 568 U.S. at 258 (quoting *Grable*, 545 U.S. at 313-14).

15.     As set forth below, this case meets all four requirements.

**A.      The Tribe's Claims Necessarily Raise an Issue of Federal Law**

16.     Resolving the Tribe's claims will require the Court to determine whether a federally recognized Indian tribe, whose members are entitled to and received federally-funded healthcare services, may recover from alleged third-party tortfeasors the costs of providing such services. Healthcare for members of the Tribe—like all federally recognized Indian tribes—is subject to a comprehensive federal regime governing costs and funding, including recovery of costs from third parties.

17.     The federal government funds healthcare services provided to the Tribe's members. "Congress has unambiguously declared that the federal government has a legal responsibility to provide health care to Indians," stemming "from the 'unique relationship' between Indians and the federal government." *White v. Califano*, 581 F.2d 697, 698 (8th Cir. 1978) (quoting and affirming district court); *see also, e.g.*, 25 U.S.C. §§ 1601, 1602; *Rosebud Sioux Tribe v. United States*, 2017 WL 1214418, at *8 (D.S.D. Mar. 31, 2017) (noting "the trust responsibility of the United States to provide health care to American Indians"); 42 C.F.R. § 136.12.

18.     This funding, and the health care services it provides, is subject to a comprehensive federal regime. Under the Indian Health Care Improvement Act ("IHCIA"), 25 U.S.C. § 1601 *et seq.*, the Indian Health Service ("IHS") "carr[ies] out the responsibilities,

authorities, and functions of the United States to provide health care services to Indians and Indian tribes[.]" *Id.* § 1661(a)(1); *see also Navajo Health Foundation-Sage Mem'l Hosp., Inc. v. Burwell*, 100 F. Supp. 3d 1122, 1126 n.1 (D.N.M. 2015) ("The Indian Health Service . . . is a division of the Department of Health and Human Services that is the principal health care provider for members of federally recognized American Indian tribes."). The IHCIA "funds a vast array of medical treatment . . . for individual members of Indian Nations [and] does so exclusively by Congressional appropriations and federal monies passed through the Secretary of the Interior." *Acoma Pueblo v. Am. Tobacco Co.*, 2001 WL 37125252, at *6 (D.N.M. Feb. 20, 2001).

19.     The IHS budget funds healthcare for tribal members in several ways, including direct provision of medical services and programs. Alternatively, in many cases, tribes are delegated responsibility to administer such funds through self-determination contracts or compacts with the IHS pursuant to the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 5301 et seq., which provide tribes with greater authority over how to expend federal funds for the welfare of their members. *See Burwell*, 100 F. Supp. 3d at 1126 n.2 (ISDEAA "authorizes the United States to enter into contracts with American Indian tribes in which the tribe agrees to supply federally funded services that a federal agency normally would provide." (citing 25 U.S.C. § 450f(a)).

20.     Because health care for members of the Tribe is funded by the federal government pursuant to this federal framework, in many instances it is the federal government—not the Tribe—that ultimately suffers injury when healthcare services are provided to tribal members injured by tortfeasors. The reason is simple: the cost of that care was derived from funds appropriated by the United States, not the Tribe. Accordingly, whether the Tribe can establish

cognizable injury—an element of their claims—necessarily raises a question of federal law. *See, e.g., Prill v. Marrone*, 23 So. 3d 1, 6 (Ala. 2009) (negligence); *Exxon Mobil Corp. v. Alabama Dep't of Conservation & Nat. Res.*, 986 So. 2d 1093, 1114 (Ala. 2007) (fraud); *Russell Corp. v. Sullivan*, 790 So. 2d 940, 951 (Ala. 2001) (nuisance).

21.     In *Acoma*, for instance, certain Indian Nations sued tobacco companies for an alleged deceptive campaign to conceal the risks of smoking, and the tribes sued in state court to "recover[] . . . funds spent by tribal governments and the Indian Health Service for tobacco-related health costs." 2001 WL 37125252, at *1. Though all claims were pleaded under state law, the defendants removed the case on the ground that plaintiffs "cannot establish the elements of any state law claim until there has been a preliminary determination that Plaintiffs state a cognizable injury entitling them to the reimbursement they seek[,]" which requires "interpretation of federal law." *Id*. at *3. Given the important federal interests, the district court held it had jurisdiction and denied plaintiffs' motion to remand. *Id*. at *7-8.

22.     The *Acoma* court explained that "[i]n this case, unlike most cases resting on a state law tort claim, the fact of an injury is not readily demonstrable. In this case an injury, a central element of . . . Plaintiffs' state law causes of action, cannot be established without an interpretation of federal law." *Id*. at *7. Because "construction of the Indian Health Care Act and statutes intrinsically related will determine whether Plaintiffs have an injury-in-fact," federal law was "pertinent not as a defense, but as the only means of deciding whether Plaintiffs stand in a position to have been harmed," and "[o]nly after these matters are established will Plaintiffs' allegations of fraud, negligence, negligent misrepresentation and other tortious acts be material." *Id*. Accordingly, the court in *Acoma* denied remand.

23.     This Court reached the same conclusion in staying a substantially similar case brought by the Tribe against manufacturers and distributors of prescription opioids pending transfer to the MDL. *Poarch Band of Creek Indians*, 2020 WL 3833009. Presented with nearly identical state law claims as the ones asserted by the Tribe in this action, this Court found that "the Complaint necessarily raises legally and/or factually complex issues relating to the Tribe's standing to pursue the claims and damages delineated in its pleading." *Id*. at *5. As this Court explained, "[t]hose issues may require examination and application of the federal statutory and regulatory regime for Indian health care, which may in turn be sufficient to trigger the 'substantial federal issue' basis for federal question jurisdiction under the *Grable / Gunn* line of authorities." *Id*.

24.     Importantly, this Court rejected the Tribe's argument that no federal issue was presented because the Complaint sought "significant relief beyond any funds provided by the federal government, including recovery of the Tribe's own tribal funds and abatement of the serious public nuisance created by Defendants." *Id*. at *5 n.7. As the Court noted, "a central form of relief demanded in the Complaint is recovery of the costs of providing health care services to tribal members," some of which "[could] well be the subject of comprehensive federal legislation and regulation" that could require an analysis of the federal scheme in order to establish the Tribe's standing. *Id*. Having "chose[n] to frame its claims and its damages in terms of recovery of funds spent on opioid-related health care services and treatments for tribal members," the Tribe "cannot sidestep the jurisdictional implications of those allegations via blanket statements that '[t]his case is not about recovery of federal funds.'" *Id*. at *5.

25.     Similarly, the Tribe cannot avoid implicating the federal regime for funding Indian healthcare in this case merely by contending that some unspecified portion of the funds it

seeks to recover did not originate from federal sources, Compl. ¶ 17, or disavowing reliance on federal law for its claims, *id*. ¶ 53. The Tribe expressly seeks to recover the "massive costs [from] providing uncompensated care as a result of opioid-related conditions," without any regard for the source of those expenditures. *Id*. ¶ 241; *see also id*. ¶¶ 62-63. As before, "a cornerstone of the Tribe's theory of recovery in this case is that defendants should pay the Tribe for monetary losses incurred in providing medical care and treatment for citizens with opioid-related conditions." *Poarch Band of Creek Indians*, 2020 WL 3833009 at *1. A significant portion – if not a majority – of those costs are ultimately borne by the federal government pursuant to a comprehensive funding and regulatory regime governed by federal law.[2]

26.     Because "[t]he Indian Health Care Act and related law is pertinent not as a defense, but as the only means of deciding whether [the Tribes] stand in a position to have been harmed," *Acoma Pueblo*, 2001 WL 37125252, at *7,[3] the Tribe cannot establish standing to pursue its claims "without in-depth interpretation and application of the federal regime that

---

[2] In its Complaint, the Tribe asserts that the Buford L. Rolin Clinic is a "self-funded health clinic" that provides treatment and services for its members and members of other federally recognized tribes. Compl. ¶ 61. But as the Tribe has acknowledged elsewhere, the Buford L. Rolin Clinic receives funding through IHS. *See* Tribal Health Improvement Plan 2015-2020, http://porchcreekindians.org/pdf/tribal_health_improvement_plan.pdf ("The PBCI operates a full service, out-patient health clinic funded through Indian Health Service (IHS)"). More broadly, the Tribe has received millions of dollars from IHS to fund healthcare for its members for each year of the period at issue in this action. *See* https://taggs.hhs.gov/Detail/AwardDetail?arg_AwardNum=65G990059&arg_ProgOfficeCode=234.

[3] To be clear, the federal scheme *does* establish meritorious defenses to the Tribe's claims, which McKesson will raise at the appropriate time. But for purposes of removal, the federal scheme is pertinent because it must be analyzed in order for the Tribe to establish cognizable harm, an essential element of its claims.

provides health care funding to tribal members . . . ." *Poarch Band of Creek Indians*, 2020 WL 3833009, at *5. Accordingly, the Tribe's claims necessarily raise a federal question.

**B.    The Federal Issue Is Actually Disputed**

27.    The parties dispute whether the Tribe may recover healthcare costs from McKesson. Indeed, "on the merits, it is the central point of dispute."  *Gunn*, 568 U.S. at 259. The Tribe expressly seeks to recover these costs, and McKesson will argue these costs are not recoverable under applicable federal law because (among other reasons) the Tribe has not sustained a cognizable injury.

**C.    The Federal Issue Is Substantial**

28.    "The substantiality inquiry . . . looks . . . to the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260. "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312. Here, there can be no serious dispute that the federal issue is important "to the federal system as a whole." *Gunn*, 568 U.S. at 260.

29.    The federal issue has "broader significance . . . for the Federal Government." *Id.* at 260. Any decision in this case could establish precedent for future actions in which the federal government seeks to recover Indian health care costs from third-party tortfeasors under the Federal Medical Care Recovery Act. *See* 25 U.S.C. § 1621e(e)(3)(A) (establishing exclusive cause of action for Indian tribes for recovery of ISDEAA health care costs). This is because federal law places Indian nations in the shoes of the federal government when pursuing health care costs from third-party tortfeasors. *See id.* Specifically, Indian nations providing health care to their members

11

under an ISDEAA compact may only recover from third-party tortfeasors "in accordance with the Federal Medical Care Recovery Act" and—critically—only "to the same extent and under the same circumstances as the United States may recover under that Act." *Id.* And it is well-established that "[t]he Government . . . has a direct interest in the availability of a federal forum to vindicate its own administrative action." *Grable*, 545 U.S. at 315.

30. Moreover, the United States filed a Statement of Interest in the opiate MDL "to attend to its interests in connection with" the MDL proceedings and to "inform the [MDL] Court of some of the substantial costs that the federal government has borne as a result of the opioid epidemic." Statement of Interest, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804 (N.D. Ohio Mar. 1, 2018), ECF No. 161, at 1. The Statement of Interest explained that "federal statutes afford the United States the right to recover funds when the United States has paid for or provided treatment" (*id.* at 4), and specifically identified the Federal Medical Care Recovery Act as permitting the federal government to recover the value of "medical services" "furnishe[d] . . . to a person who is injured under circumstances creating tort liability on a third party" (*id.* at 5-6).

31. Additionally, the construction of federal health care statutes or compacts "will control many other cases" and is thus "more likely to be a substantial federal question." *Edwards v. Deloitte & Touche, LLP*, 2017 WL 1291994, at *5 (S.D. Fla. Jan. 18, 2017) (concluding "there is clearly a substantial federal issue in this case" because "there are currently several suits in the federal system seeking to determine if the actors in the Net Worth Sweep are liable to the shareholders of Fannie Mae and Freddie Mac."); *see also Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 468 (7th Cir. 2015) (state law breach of contract claims presented a substantial federal question where, among other things, "[s]imilar lawsuits have been brought nationwide by Section 8 property owners. . . . In the aggregate, these

cases have the potential to substantially influence the scope and success of the Section 8 program."). To date, over 100 opioid-related actions have been filed by Indian tribes across the country seeking to recover, among other things, costs of providing opioid-related healthcare services to their members. All of those actions have been transferred or conditionally transferred to the opiate MDL for coordinated proceedings.[4]

### D.     The Federal Issue Is Capable of Resolution in Federal Court Without Disrupting the Federal-State Balance Approved by Congress

32.     "[T]his Court's exercise of jurisdiction would not unduly disrupt the federal-state balance of power" because "[t]he 'congressionally approved balance of federal and state judicial responsibilities' as to Indian tribes is heavily weighted on the federal side." *Massachusetts v. Wampanoag Tribe of Gray Head*, 36 F. Supp. 3d 229, 235 (D. Mass. 2014) (denying remand motion); *see also Pelt v. State of Utah*, 104 F.3d 1534, 1544 (10th Cir. 1996) ("The overriding legal area implicated in this case is the care of Native Americans—a uniquely federal question. . . . [T]his case involves an area of law not within the purview of the states, but rather one that is solidly within the federal realm." (citation omitted)); *Michigan v. Bay Mills Indian Cmty.*, 695 F.3d 406, 413 (6th Cir. 2012) ("Indian law is primarily the province of the federal courts.").

33.     Because the Tribe's claims present an issue of federal law that is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without

---

[4] *The Cherokee Nation v. McKesson Corporation, et. al.* was originally filed in Oklahoma state court, removed on federal officer grounds to the Eastern District of Oklahoma, and transferred to the opiate MDL. The MDL Court found that the removal was proper and that federal officer jurisdiction was established because the plaintiff's allegations implicated McKesson's performance of a contract with the federal government. *See* Opinion and Order*, In re Nat'l Prescription Opiate Litig.*, 1:17-md-02804 (N.D. Ohio Sept. 4, 2018), ECF No. 74. The case was subsequently transferred to the district court for the Eastern District of Oklahoma to serve as a bellwether federal trial. *In re Nat'l Prescription Opiate Litig.*, 1:17-md-02804 (N.D. Ohio Feb. 10, 2020), ECF No. 3160.

disrupting the federal-state balance approved by Congress[,]" this Court has subject matter jurisdiction over at least one claim here. *Gunn*, 568 U.S. at 258. And because this Court has jurisdiction over at least one claim, it has supplemental jurisdiction over all remaining claims because they "are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *see also R.I. Fishermen's All., Inc. v. R.I. Dep't Of Envtl. Mgmt.*, 585 F.3d 42, 48 (1st Cir. 2009) ("[I]f the district court had original jurisdiction over any one of these causes of action, then it had supplemental jurisdiction over the rest.").

## IV. THIS COURT ALTERNATIVELY HAS SUBJECT MATTER JURISDICTION UNDER 28 U.S.C. § 1331 BECAUSE THE TRIBE'S CLAIMS NECESSARILY REQUIRE A FEDERAL RULE OF DECISION

34.     The Tribe asserts state law causes of action for tribal healthcare cost recovery from alleged third-party tortfeasors. (Compl. ¶¶ 221-302.) Ordinarily, such claims must be asserted under the federal Indian Health Care Improvement Act, which creates a single cause of action for Indian tribes to seek "damages, reimbursement, or indemnification" for health care  expenditures under ISDEAA contracts or compacts from insurers and third-party tortfeasors. 25 U.S.C. § 1621e(a), (e)(3)(A). In an apparent effort to evade federal jurisdiction, the Tribe did not expressly assert claims under these directly applicable statutory provisions. Instead, they asserted purported state law claims for negligence; nuisance; unjust enrichment; fraud and deceit; wantonness; and a violation of the Alabama Deceptive Trade Practices Act. (Compl. ¶¶ 221-302.)

35.     Even if a tribe could avoid the statutory right-of-action provisions by asserting the substance of that claim as a collection of other causes of action—something the Court need not decide at this stage—any non-statutory claim necessarily would be one under federal, not state,

common law, providing this Court with an additional, independent ground for subject matter jurisdiction. *See Nat'l Farmers Union Ins. Co.*, 471 U.S. at 850 (28 U.S.C. § 1331 grants federal courts jurisdiction over "claims founded upon federal common law as well as those of a statutory origin." (quoting *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972))).

36.     As an initial matter, the federal power to regulate Indian affairs stems from the Constitution. The Indian Commerce Clause grants Congress the power "[t]o regulate Commerce . . . with the Indian Tribes[.]" U.S. Const. art. I, § 8, cl. 3. This power has "consistently" been described as "plenary and exclusive." *United States v. Lara*, 541 U.S. 193, 200 (2004) (citations omitted); *see also Oneida Cty. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 234 (1985) ("With the adoption of the Constitution, Indian relations became the exclusive province of federal law."). Indeed, "Indian law is uniquely federal in nature, having been drawn from the Constitution, treaties, legislation, and an 'intricate web of judicially made Indian law.'" *Wilson v. Marchington*, 127 F.3d 805, 813 (9th Cir. 1997) (quoting *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 206 (1978)). Thus, "federal common law arises as a function of a long-held federal governance of Indian territories, and the statutory and constitutional scheme in place to further such governance." *Richardson v. Malone*, 762 F. Supp. 1463, 1468 (N.D. Okla. 1991).

37.     Claims that directly implicate the federal government's trust responsibilities to Indian tribes are necessarily governed by federal law. *Standard Oil*, 332 U.S. 301, is instructive. There, the United States sought to recover from a third-party tortfeasor the costs of health care provided by the federal government to a soldier. *Id.* at 302. The U.S. Supreme Court held that the government's ability to recover those costs was necessarily and exclusively a question of federal law. *Id.* at 305 ("[T]he creation or negation of such a liability is not a matter to be determined by state law."). That was so because the government-soldier

15

relation was "distinctively federal in character," its characteristics "fundamentally derived from federal sources and governed by federal authority." *Id*. at 305-06.   This conclusion was bolstered by the fact that "the Government's purse is affected."   *Id.* at 306.

38.    The same is true here. Like the "government-soldier relation," the relationship between the United States and federally recognized Indian tribes is "distinctively and exclusively a creation of federal law[,]" *Standard Oil*, 332 U.S. at 310; *see also Oneida Cty.* 470 U.S. at 234 ("With the adoption of the Constitution, Indian relations became the exclusive province of federal law."). This is the case especially with respect to the federal government's obligation to provide Indian health care and the concomitant ability to recover the costs of such care from third party tortfeasors. *See*, *e.g.*, *White*, 581 F.2d at 698; *Rosebud Sioux Tribe*, 2017 WL 1214418, at *8.[5] In the ISDEAA, Congress chose to fulfill its trust responsibilities to tribes by allowing them to enter contracts pursuant to which the tribes provide services to their members "that otherwise would have been provided by the Federal Government." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 185 (2012). While tribes providing services under ISDEAA compacts retain significant discretion to decide how to expend federally appropriated funds, the tribes are nonetheless performing federal functions and subject to federal oversight and requirements. Thus, claims implicating the federal government's long-standing obligation to provide members of Indians tribes with health care, and the ability to recover the costs of such care from third parties, cannot be determined "by reference to varying state policies."   *Standard Oil*, 332 U.S. at 311.

39.    To be sure, not every case involving tribes or tribal members automatically presents a federal question. But this case implicates the United States' "special trust responsibilities and

---

[5] *See also* https://www.ihs.gov/newsroom/factsheets/basisforhealthservices/.

legal obligations to Indians," including its duty "to provide funding for [health care] programs and facilities operated by Indian tribes and tribal organizations," 25 U.S.C. § 1602(7), questions that lie "solidly within the federal realm." *Pelt*, 104 F.3d at 1544. As the underlying obligation to fund health care for Indians necessarily arises as a matter of federal law, so too must the rules governing whether and to what extent tribes may seek indemnification for such costs from third parties. *See Standard Oil*, 332 U.S. at 311. Moreover, the Tribe's ability to recover such federal funding from third party tortfeasors could in some instances affect "the Government's purse[.]" *Id.* at 306; *see also*, *e.g.*, *United States v. Largo*, 775 F.2d 1099, 1102 n.3 (10th Cir. 1985) ("[F]ederal grant money does not lose its federal character simply because it is administered by a nonfederal agency such as [a tribal organization].").

40.    Accordingly, to the extent the Tribe can bring claims for healthcare cost recovery outside the statutory rights of action provided by Congress, any such claim would necessarily be governed by federal law, and "a federal rule of decision is 'necessary to protect [these] uniquely federal interests." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981).[6]

## V.    ALL OTHER REMOVAL REQUIREMENTS ARE SATISFIED

41.    McKesson was served with the Complaint on August 10, 2020. In accordance with 28 U.S.C. § 1446(b), this Notice of Removal is timely filed within 30 days of service of

---

[6] That the Tribe's claims implicate unique federal interests requiring a uniform statement of decision from the federal courts does *not* mean the Tribe is entitled to relief, or that the Tribe has a federal remedy. The question of whether the Tribe's claims give rise to federal jurisdiction is separate from whether the Tribe's allegations state a claim under federal common law. *See Standard Oil*, 332 U.S. at 313 (declining to fashion a federal common law remedy after determining that state law cannot apply; deferring instead to Congress' prerogative to authorize such causes of action).

Plaintiffs' Complaint. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-56 (1999) (30-day removal period begins to run upon service of summons and complaint).

42.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 81, 1391, 1441(a), and 1446(a) because the state court where the suit has been pending is in this district.

43.     A copy of the state court docket sheet is attached as **Exhibit 1**. In accordance with 28 U.S.C. § 1446(a), copies of all documents filed or served upon McKesson in the state court action are attached as **Exhibit 2**.

44.     By filing this Notice of Removal, McKesson does not waive and expressly reserves all defenses, including those related to personal jurisdiction and service of process.

45.     If any question arises as to propriety of removal to this Court, McKesson requests the opportunity to present a brief and oral argument in support of its position that this case has been properly removed.

46.     Pursuant to 28 U.S.C. § 1446(d), McKesson will promptly file a copy of this Notice of Removal with the clerk of the state court where the lawsuit has been pending and serve notice of the filing of this Notice of Removal on Plaintiff. McKesson reserves the right to amend or supplement this Notice.

WHEREFORE, McKesson removes this action from the Circuit Court of Mobile County, Alabama, Case No. 02-CV-2020-901671.00, to this Court.

September 4, 2020                              /s/    *Harlan I. Prater, IV*
                                              Harlan I. Prater, IV
                                              Jackson R. Sharman, III
                                              Jeffrey P. Doss
                                              Brandon K. Essig
                                              Benjamin P. Harmon
                                              LIGHTFOOT, FRANKLIN & WHITE LLC

The Clark Building
400 20th Street North
Birmingham, AL 35203
hprater@lightfootlaw.com
jsharman@lightfootlaw.com
jdoss@lightfootlaw.com
bessig@lightfootlaw.com
bharmon@lightfootlaw.com

*Counsel for McKesson Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was electronically filed on this the 4th day of September, 2020 using the CM/ECF system which will send notification to all counsel of record, including counsel for the Plaintiffs, listed below. Should the Notice of Electronic Filing indicate that notice needs to be delivered by other means, I certify that a copy will be sent via U.S. Mail, postage prepaid and properly addressed.

T. Roe Frazer II
Patrick D. McMurtray
FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
(615) 647-6464
roe@frazer.law
patrick@frazer.law

Thomas Roe Frazer III
W. Matthew Pettit
FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
(615) 647-6464
trey@frazer.law
mpettit@frazer.law

Archie Lamb
LEVIN PAPANTONIO
THOMAS MITCHELL RAFFERTY PROCTOR P.A.
316 South Baylen St.
Pensacola, FL 32502
(850) 435-7000
alamb@levinlaw.com

J. Nixon Daniel, III
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
(850) 432-2451
jnd@beggslane.com

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP
2013 1st Avenue North, Ste 450
Birmingham, Alabama 35203
(205) 252-6127

ftk@thekuykendallgroup.com

        /s/ *Harlan I. Prater, IV*
OF COUNSEL