# Exhibit 2

ELECTRONICALLY FILED
8/5/2020 4:06 PM
02-CV-2020-901671.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev. 9/18 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Cas<br>02 |
|---|---|---|

Date of Filing:     Judge Code:
08/05/2020

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA
### POARCH BAND OF CREEK INDIANS v. MCKESSON CORPORATION

**First Plaintiff:**  ☐ Business   ☐ Individual      **First Defendant:**  ☑ Business   ☐ Individual
☐ Government   ☑ Other                                   ☐ Government   ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA - Wrongful Death
- ☑ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☐ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**
- ☐ TOPE - Personal Property
- ☐ TORE - Real Property

**OTHER CIVIL FILINGS**
- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**
- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/<br>Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/<br>Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ EPFA - Elder Protection From Abuse
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP - Workers' Compensation
- ☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:**   F ☑ INITIAL FILING        A ☐ APPEAL FROM<br>DISTRICT COURT        O ☐ OTHER

R ☐ REMANDED        T ☐ TRANSFERRED FROM<br>OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?**  ☑ YES  ☐ NO      **Note:** Checking "Yes" does not constitute a demand for a<br>jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**        ☑ MONETARY AWARD REQUESTED   ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**

FRA031                  8/5/2020 4:06:22 PM              /s/ THOMAS ROE FRAZER II
_____          _____          _____
                        Date                            Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:**        ☐ YES ☑ NO  ☐ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:**        ☐ YES ☐ NO

ELECTRONICALLY FILED
8/5/2020 4:06 PM
02-CV-2020-901671.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## IN THE CIRCUIT COURT OF
## MOBILE COUNTY, ALABAMA

| | | |
|---|---|---|
| **POARCH BAND OF CREEK INDIANS** | § | |
| **Plaintiff,** | § | **Civil Action No. _____** |
| **vs.** | § | |
| **McKESSON CORPORATION; And DOE** | § | |
| **1-100, being those persons, firms,** | | |
| **corporations, agents, servants and/or** | § | **JURY DEMAND** |
| **employees who authorized, ordered and/or** | | **REQUESTED** |
| **committed the acts described in this Complaint** | § | |
| **and whose names when ascertained will be** | | |
| **substituted by amendment by Plaintiff;** | § | |
| **Defendant.** | § | |

"The opioid epidemic is the deadliest drug crisis in American history. . . ." Attorney General William P. Barr announced in a press release on April 17, 2019.[1]

The decade of the 1990s was the era of the blockbuster drug, the billion-dollar pill, and a pharmaceutical sales force arms race was part of the excess of the time . . . . A pharmaceutical Wild West emerged. Salespeople stampeded into offices. They made claims that helped sell the drugs to besieged doctors. Those claims also lead years later to blockbuster lawsuits and criminal cases against their companies.[2]

"The opioid epidemic poses one of the most significant public health threats in recent history, and is particularly virulent in American Indian and Alaska Native communities."[3]

## COMPLAINT

---

[1] Press Release, U.S. Dep't of Justice, Appalachian Regional Prescription Opioid (ARPO) Strike Force Takedown Results in Charges Against 60 Individuals, Including 53 Medical Professionals (Apr. 17, 2019), https://www.justice.gov/opa/pdappalachian-regional-prescription-opioid-arpo-strike-force-takedown-results-charges-against.

[2] Sam Quinones, *Dreamland: The True Tale of America's Opiate Epidemic* at 133 (Bloomsbury Press 2015) (hereinafter referred to as "Dreamland").

[3] *Addressing the Opioid Epidemic in American Indian and Alaska Native Communities*, National Indian Health Board, https://www.nihb.org/docs/09182017/Opioids%20One%20pager.PDF.

Plaintiff Poarch Band of Creek Indians (the "Tribe") brings this Complaint against Defendant McKesson Corporation ("McKesson") under Alabama state common and statutory law for negligence, nuisance, unjust enrichment, fraud and deceit, wantonness, and violations of the Alabama Deceptive Trade Practices Act, seeking judgment against Defendant and in favor of the Tribe for compensatory damages; punitive damages; prejudgment and post-judgment interest; costs of suit; and equitable relief, including injunctive relief, and allege as follows:

## I.    **INTRODUCTION**

### A.  The Opioid Crisis in Alabama

1.      The opioid epidemic is an ongoing crisis in the state of Alabama, including the Tribe's community. Native Americans in Alabama currently face an opioid crisis that threatens to destroy native lives, land, and history. An epidemic of prescription opioid abuse is devastating the people, babies, institutions, and resources of Indian Country, and causing the Tribe to suffer substantial loss of resources, economic damages, addiction, disability, and harm to the health and welfare of the Tribe, Tribe members, and wholly-owned enterprises of the Tribe.

2.      Opioid use has had tragic consequences for communities across Alabama, including the Tribe's community. Thousands of people have died from opioid overdoses, and many thousands more suffer from opioid use disorders and related health conditions in Alabama, Indian Country, and Tribe. The misrepresentations by Defendant described herein regarding the risks and benefits of opioids enabled, and are continuing to enable, the widespread prescribing of opioids for common chronic pain conditions like lower back pain, arthritis, and headaches.[4]

---

[4] Consistent with the commonly accepted medical usage, the term "chronic pain" as used herein refers to non-cancer pain lasting three months or longer.

3.      Overdose mortalities in Alabama have increased sharply in recent years. From 2013 to 2014 alone, Alabama saw a twenty percent (20%) increase in overdose fatalities.[5] In 2014, there were 723 Alabama overdose deaths, up from 598 Alabama overdose deaths in 2013.[6] These deaths are overwhelmingly caused by opioids.[7]  No fewer than 282 deaths were attributable to opioid overdose in 2015 alone in Alabama.[8]  In 2017, there were 422 overdose deaths involving opioids in Alabama – a rate of 9.0 deaths per 100,000 persons and over half the national rate of 14.6 deaths per 100,000 persons.

4.      The greatest increase in opioid deaths occurred among cases involving synthetic opioids (mainly fentanyl), with a rise from 16 deaths in 2012 to 198 in 2017. Heroin involved deaths also increased dramatically from 40 deaths in 2013 to 122 in 2014 but have remained unchanged through 2017.

5.      Since 2005, Alabama has participated in the Prescription Drug Monitoring Program, which collects prescription records. On August 8, 2017, Alabama Governor Kay Ivey established the Alabama Opioid Overdose and Addiction Council to study the state's opioid crisis and identify a strategy to counteract its adverse consequences.

6.      Alabama has the second-highest rate of nonmedical use of prescription pain relievers in the nation, covering one out of every nineteen Alabamians aged twelve or older.[9] Drug

---

[5]    Centers  for  Disease  Control  and  Prevention,  Drug  Overdose  Death  Data, https://www.cdc.gov/drugoverdose/data/statedeaths.html.

[6] *Id.*

[7] X.J. Shen, Ph.D., Director, Division of Statistical Analysis, Alabama Department of Public Health, Center for Health Statistics, Data-Driven Prevention Initiative (DDPI) for Heroin and Opioid Abuse/Overdose (April 28, 2017), *available at* http://www.alabamapublichealth.gov/pharmacy/assets/ddpi opioidoverdose.pdf.

[8] The Henry J. Kaiser Family Foundation, Opioid Overdose Deaths and Opioid Overdose Deaths as a Percent of All Drug Overdose Deaths (2015), www.kff.org.

[9] Rachel N. Lipari, Ph.D., et al., State and Substate Estimates of Nonmedical Use of Prescription Pain Relievers, National Survey on Drug Use and Health, Substance Abuse and Mental Health Services Administration (Jul. 13, 2017), https://www.samhsa.gov/data/sites/default/files/report 3187/ShortReport-3187.html.

poisoning deaths are significantly impacting the Tribe's communities.[10] Significant numbers of the residents of Alabama report drug dependence and nonmedical use of pain relievers.[11] Many residents of Alabama, including the Tribe and its citizens, who need addiction treatment do not receive it.[12]

7.     American Indians are at least two times more susceptible to opioid addiction than the rest of the U.S. population at large. American Indian high school students are two to three times more prone to try opioid pills than U.S. teenagers in general. American Indians are three (3) times more likely to die from a drug overdose than the rest of the U.S. population. American Indian Country is usually located in more rural parts of the U.S., where medically assisted addiction treatment is unavailable, underfunded, or overwhelmed by demand. Often, American Indians cannot even find opioid addiction treatment within a reasonable proximity.

8.     Between 1999 and 2015, overdose rates in the Indian Country had increased by 500 percent.[13] Additionally, one in ten Native American children will misuse prescription opioids, a figure twice that of white children while pregnant Native Americans are "eight times more likely to be diagnosed with opioid dependence than pregnant white folks".[14]

9.     Prescription opioids killed over 40,000 Americans in 2017. Prescription opioids kill twice as many people in the U.S. as heroin. Prescription opioids and related drug overdose deaths exceed the number of car accident deaths in the United States. Nearly 150 Americans die every day from opioids overdoses. Almost 91% of persons who have a non-fatal overdose of opioids are prescribed opioids again within one year. One third (1/3) of all children who go into foster parent

---

[10] U.S. Centers for Disease Control and Prevention, National Center for Health Statistics' Drug Poisoning Mortality dataset, https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality/.
[11] *See,* e.g., Alabama Opioid Epidemic, amfAR, http://opioid.amfar.org/AL, at View Counties: Opioid Use.
[12] *Id.* at View Counties: Healthcare.
[13] Stephanie Valenzuela, *In Plain Sight: How the Opioid Crisis Has Ravaged Indian Country*, Lakota Peoples Law Project (July 5, 2018), https://www.lakotalaw.org/news/2018-07-05/opioid-crisis.
[14] *Id.*

care do so because of the opioids addiction of their parent(s). Seven (7) in ten (10) opioid overdoses are treated in an emergency room due to the abuse of prescription opioids. An opioid-addicted baby is born every thirty (30) minutes in America.

10.    American Indians, including the Tribe's citizens, have been left out of major initiatives conducted by Alabama's state government and/or municipal governments in their attempts to remedy the ongoing opioid crisis.

11.    Excessive numbers of opioids have been dispensed in and around the Tribe's community. From 2006 to 2012, there were 1,703,752,769 prescription pain pills supplied to Alabama.[15] From 2006 to 2012, there were 22,035,540 prescription pain pills, enough for 64 pills per person per year, supplied to Escambia County, Alabama. Additionally, there were 150,242,536 prescription pain pills, enough for 52 pills per person per year, supplied to Mobile County, Alabama, and 29,307,180 of the pills were distributed by McKesson Corporation.[16]

12.    In 2017, 107.2 opioid prescriptions were written in Alabama for every 100 persons. This was the highest prescribing rate in the country and was almost twofold greater than the average U.S. rate of 58.7 prescriptions. [17] Alabama is second in the nation for benzodiazepine prescriptions, at a rate of 61.9 per 100 persons (U.S. median rate: 37.6).[18] Over 6.5 million opioid prescriptions were filled in Alabama in 2015, supplying over 437 million pills, which equates to a total days'

---

[15] THE WASHINGTON POST, The Opioid Files: Drilling into the DEA's pain pill database, Jul. 21, 2019, https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/ (hereinafter "Drilling into the DEA's pain pill database").

[16] *Id.*

[17] *Id.*

[18] *See* Leonard J. Paulozzi, M.D., et al., Centers for Disease Control and Prevention, *Vital Signs: Variation Among States in Prescribing of Opioid Pain Relievers and Benzodiazepines – United States, 2012,* Morbidity and Mortality Wkly. Rep. July 4, 2014; 63(26); 563-568, *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6326a2.htm. The combination of hydrocodone, oxycodone and benzodiazepines is referred to as the "holy trinity" and significantly increases the risk of harm to those that abuse prescription pills.

supply of 127,159,152 – or 348,381 years' worth.[19] There were 167 deaths involving prescription opioids in 2017, an increase from 124 in 2016.[20]

13.　　Children have been especially vulnerable to the opioid epidemic. Alabama, the Tribe, and neighboring states have now become ground zero for an explosion of cases in newborns with Neonatal Abstinence Syndrome ("NAS"), a collection of symptoms babies experience in withdrawing from opioid medications taken by the mother. The region that includes Alabama, Mississippi, Tennessee, and Kentucky has the highest rate in the country, with NAS occurring in 16.2 out of every 1,000 hospital births in 2012.[21] NAS is closely associated with opioid use.[22] Infants born with NAS usually spend weeks in neonatal intensive care units while they painfully withdraw from the drugs – a process so painful that it traps many adults on opioids.

14.　　Children, including the Tribe's children, are also injured by the removal from their homes due to opioid abuse and addiction. The percentage of Alabama children in foster care because of parental drug abuse has risen from 11.5% in 2006 to 37% in 2016.[23] Children with parents addicted to drugs tend to stay in foster care longer and often enter the system having experienced significant trauma, which makes their care more expensive.[24]

---

[19] George C. Smith, Jr., M.D., ALBME Efforts to Combat Opioid Overuse, Alabama Board of Medical Examiners (March 10, 217), http://alabamapublichealth.gov/pharmacy/assets/presentation_smith_2017.pdf.
[20] National Institute on Drug Abuse, *Alabama Opioid Summary,*
https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/alabaina-opioid-summary.
[21] Amy Yurkanin, A grim and growing trend: Alabama sees increased cases of drug-dependent newborns (Sep. 29, 2015), *available at*
http://www.al.com/news/index.ssf/2015/09/a grim and growing_trend alaba.html.
[22] Casey Wylie, Quality Analytics, ALABAMA MEDICAID AGENCY**,** *Neonatal Abstinence Syndrome (NAS) Adverse Fetal Outcomes in Mothers with Prescribed Opioid Medications Compared to Mothers With No Prescribed Opioid Medications* (December 10, 2014),
http://www.alabarnapublichealth.gov/perinatal/assets/NASPresentationforSCPH.pdf.
[23] Mary Sell, *Parental drug use putting more children in foster care,* DECATUR DAILY (Jan. 29, 2017), http://www.decaturdaily.cominews/local/parental-drug-use-putting-more-children-in-fostercare/article　957642a9-e3d5-52a3-b8d9-d881be352aab.html, citing Alabama Department of Human Resources.
[24] Trista Thurston, *Drug addiction drives spike in Ohio foster care,* NEWARK ADVOCATE (Mar. 23, 2017), *available at*　　http://www.newarkadvocate.comistoryinews/crime/high-in-ohio/2017/03/23/drug-addiction-drives-spike-ohiofoster-care/99545804/.

15.     Because of the opioid crisis, Indian Tribes', including the Poarch Band of Creek Indians, are running out of homes for the placement of Native American children. The children often end up in homes outside of their Tribe and risk losing the sacred bond with their home, culture, and family.[25]

16.     Across the state, Alabama families, and communities, including the Tribe, face heartbreaking tragedies that cannot be adequately conveyed by statistics, and they have faced them all too often. Many grieving families have been financially tapped out by the costs of repeated cycles of addiction treatment programs; others have lost hope and given up. The increasing number of cases takes both a physical and mental toll on the Tribe, its community, and its citizens.

17.     Defendant has foreseeably caused damages to the Tribe, including the costs of providing: (a) medical care, additional therapeutic and prescription drug purchases, and other treatments for individuals suffering from opioid-related addiction or disease, including overdoses and deaths; (b) counseling and rehabilitation services; (c) treatment of infants born with opioid-related medical conditions; (d) welfare and foster care for children whose parents suffer from opioid-related disability or incapacitation; and (e) law enforcement and public safety relating to the opioid epidemic within the Tribe. All of these are separate and additional costs that the Tribe has had to bear. These costs are separate from, and unrelated to, any federal funding that the Tribe receives. The Tribe has also suffered substantial damages relating to the lost productivity of the Tribe, as well as increased administrative costs.

## B.  The Opioid Crisis Nationally

18.     The United States is in the midst of an opioid epidemic caused by Defendant's unlawful distribution of prescription opioids that has resulted in addiction, criminal activity,

---

[25] *In Plain Sight: How the Opioid Crisis Has Ravaged Indian Country* (2018).

serious health issues, and the loss of life.[26]

19.    The United States constitutes 4.6% of the world's population but consumed 80% of the world's opioid supply in 2011.[27] According to the Centers for Disease Control and Prevention ("CDC"), from 1999 to 2014, the sales of prescription opioids in the U.S. nearly quadrupled, but there was no overall change in the amount of pain that Americans reported.[28]

20.    Between the start of the century and the year 2014, opioid-related death rates have increased by 200%. Fourteen percent of that increase occurred between 2013 and 2014.[29]

21.    It is undisputed that opioids are both addictive and deadly. Between 1999 and 2014, more than 165,000 Americans died of opioid overdose.[30] Deaths related to opioids are accelerating. In 2011, the CDC declared that prescription opioid deaths had reached "epidemic levels."[31] That year, 11,693 people died of prescription opioid overdoses.[32] Since then, prescription opioid deaths have *more than quadrupled,* reaching 47,600 Americans in 2017 – more than ten times the number of Americans who died in the entire Iraq War.[33]

---

[26] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic, and semi-synthetic opiates.

[27] Donald Teater, Nat'l Safety Council, *The Psychological and Physical Side Effects of Pain Medications,* https://www.colorado.gov/pacificisites/default/files/Psycholigical%20and%20Physical%20Side%20Effects%20Teat er%2ONSC.pdf (citing Daneshvari R. Solanki et *al., Monitoring Opioid Adherence in Chronic Pain Patients: Assessment of Risk of Substance Abuse,* PAIN PHYSICIAN JOURNAL, 14:E119-E131, (2011), *available at* https://www.painphysicianjournal.com/current/pdf?article=MTQ0NQ%3D%3D&journal=60.

[28] Centers for Disease Control and Prevention, *Prescribing Data, available at* https://www.cdc.gov/drugoverdose/data/prescribing.html.

[29] *Id.*

[30] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016,* 65(1) Morbidity and Mortality Weekly Report (Mar. 2016), at 2, *available at* https://www.cdc.gov/mmwrivolumes/65/a/pdfs/rr6501el.pdf (hereinafter "CDC Guideline").

[31] Press Release, Centers for Disease Control and Prevention: Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www. cdc.gov/media/releases/201 1/p1101 flu pain killer overdose.html (hereinafter "Prescription Painkiller Overdoses at Epidemic Levels").

[32] Li Hui Chen et al., *Drug-poisoning Deaths Involving Opioid Analgesics: United States, 19992011,* 166 NCHS Data Brief (Sept. 2014), https://www.cdc.gov/nchs/data/databriefs/db166.pdf.

[33] U.S. Dep't of Health and Human Services, *What is the U.S. Opioid Epidemic?* (Jan. 2019), https://www.hhs.gov/opioids/about-the-epidemic/index.html; German Lopez, *2017 was the worst year ever for drug overdose deaths in America,* Vox (Aug. 16, 2018), https://www.vox.com/science-and-health/2018/8/8/16/17698204/opioid-epidemicoverdose-deaths-2017.

22.     According to the CDC, opioid overdoses killed more than 45,000 people, nationally, over a 12-month timeframe that ended in September 2017. It is already the deadliest drug epidemic in American history.[34]  If current trends continue, lost lives from opioid overdoses will soon represent the vast majority of all drug overdose deaths in the United States.



Note:  Drug overdose data available since 1999.  Source: Centers for Disease Control and Prevention | By THE NEW YORK TIMES. [35]

23.     The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid medications.[36]  In many cases, heroin abuse starts with prescription opioid abuse addiction.  An inflated volume of opioids invariably leads to increased diversion and abuse. Indeed, there is a "parallel relationship" between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated

---

[34]  The Editorial Board, *An Opioid Crisis Foretold,* THE NEW YORK TIMES (April 21, 2018), https://www.nytimes.com/2018/04/21/opinion/an-opioid-crisis- foretold. html
[35] *Id.*
[36] *See* Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (Apr. 14, 2016), doi: 10.1056/NEJMsr1601307,
https://www.nejm.org/doi/full/10.1056/NEJMsr1601307 (hereinafter "Califf et al.").

outcomes."[37] For most people who misuse opioids, the source of their drugs can typically be found in the excess supply of drugs in the community, beyond what is needed for legitimate medical purposes. Filling an opioid prescription is a significant risk factor for overdose.[38]

24.     According to the CDC, the United States is currently seeing the highest overdose death rate ever recorded.[39]   Aside from overdose, long-term opioid use is associated with a significant increase in mortality from other causes.[40]   As opioid-related deaths increase, life expectancy in the United States decreases.[41]

25.     On October 28, 2017, the President of the United States declared the opioid crisis a public health emergency.[42]

26.     This suit takes aim at the primary cause of the opioid crisis: A false narrative marketing scheme, in which the distributors involved the false and deceptive marketing of prescription opioids, which were designed to dramatically increase demand for and sale of opioids and opioid prescriptions.

27.     On the demand side, the manufacturers of opioids, who manufacture, sell and market prescription opioid painkillers, precipitated the crisis. These opioids have various brand names and generic names, including, but are not limited to, OxyContin, Kadian, Duragesic, Opana, Nucynta, fentanyl, hydrocodone, oxycodone, and others mentioned in this Complaint. Through a massive

---

[37] Dart, Richard C. et *al.*, *Trends in Opioid Analgesic Abuse and Mortality in the United States,* 372 N. Eng. J. Med. 241 (2015), DOI: 10.1056/NEJMsa1406143, *available at* https://www.nej m. orWdoi/full/10.1056/nejmsa1406143.
[38] CDC Guideline, *supra* n. 27, at 22-24.
[39] Jessica Glenza, *Opioid crisis: overdoses increased by a third across US in 14 months, says CDC,* THE GUARDIAN (March 6, 2018), https://www.theguardian.com/us-news/2018/mar/06/opioid-crisis-overdoses-increased-by-a-third-across-us-in-14-months-says-cdc.
[40] Wayne A. Ray et al., *Prescription of Long-Acting Opioids and Mortality in Patients With Chronic Noncancer Pain,* 315(22):2415-2423, JAMA (Jun. 2016), doi:10.1001/jama.2016.7789, *available at* https://jamanetwork.com/journa ls/j ama/fullarticle/2528212.
[41] National Center for Health Statistics, Life Expectancy, *available at* https://www.cdc.gov/nchs/fastats/life-expectancy.htm; Centers for Disease Control and Prevention, U.S. drug overdose deaths continue to rise; increase fueled by synthetic opioids, (March 18, 2018), https://www.cdc.gov/media/releases.2018/p0329-drug-overdose-deaths.html.
[42] Julie Hirschfeld Davis, *Trump Declares Opioid Crisis a 'Health Emergency' but Requests No Funds,* THE NEW YORK TIMES (Oct. 26, 2017), https://www.nytimes.com/2017/10/26/us/poli tics/trump-opioid-crisis.html.

marketing campaign premised on false and incomplete information, the manufacturers of opioids engineered a dramatic shift in how and when opioids are prescribed by the medical community and used by patients.

28.     The manufacturers of opioids relentlessly and methodically – but untruthfully – asserted that the risk of addiction was low when opioids were used to treat chronic pain and overstated the benefits and trivialized the risk of the long-term use of opioids. However, opioids are extremely addictive. Studies have found diagnosed opioid dependence rates in primary care settings as high as 26%.[43]   Among opioid users who received four prescriptions in a year, 41.3% meet diagnostic criteria for a lifetime opioid-use disorder.[44]   Because opioids cause tolerance and dependence, patients who take the drugs for even a short time become a physiologically captured market. According to the U.S. Department of Health and Human Services, more than two million Americans are opioid-dependent.[45]   The difficulty in stopping use is particularly true for patients first prescribed an extended-release opioid. Patients who initiated treatment on an extended-release opioid – such as OxyContin – have a 27.3% likelihood to be using opioids one year later and a 20.5% likelihood of using opioids three years later.[46]   Whether in the end, a patient meets the clinical definition of addiction or is simply dependent and unable to stop using opioids, once opioids are prescribed for even a short period of time, patients are hooked.

---

[43] CDC Guideline, *supra* n. 27.
[44] Joseph A. Boscarino et al., *Opioid-Use Disorder Among Patients on Long-Term Opioid Therapy: Impact of Final DSM-5 Diagnostic Criteria on Prevalence and Correlates, available at* https://www.nthi.nlrn.nih.gov/pme/articles/PMC4548725/; *see also* Joseph A. Boscarino et al., *Prevalence of Prescription Opioid-Use Disorder Among Chronic Pain Patients: Comparison of the DSM-5 vs. DSM-4 Diagnostic Criteria,* 30(3):185-94, Journal of Addictive Diseases (Sept. 2011), *available at* https://www.nebi.nlm.nih.gov/pubmed/21745041 (showing a 34.9% lifetime opioid use disorder).
[45] U.S. Dept. of Health and Human Services, *What is the U.S. Opioid Epidemic?* (Jan. 2019), *available at* https://www.hhs.gov/opioids/about-the-epidemic/index.html.
[46] Anuj Shah et al., *Characteristics of Initial Prescription Episodes and Likelihood of Long-Term Opioid Use – United States, 2006-2015,* 66(10):265-269, Morbidity and Mortality Weekly Report (Mar. 2017), *available at* https://www.cdc.gov/mmwr/volumes/66/wr/mm6610a1.htm.

29.     Opioids pose high risks for children and adolescents. Most of the use in this population is off-label as opioids are not approved for children. Use of prescription opioid pain medication before high school graduation is associated with a 33% increase in the risk of later opioid misuse. The misuse of opioids in adolescents strongly predicts the later onset of heroin use.[47] Nonetheless, the 2016 CDC guidelines found that there have been significant increases in opioid prescribing for children and adolescents, for conditions such as headaches and sports injuries.

30.     The manufacturers of opioids' goals were simple: dramatically increase sales by convincing doctors to prescribe opioids not only for the kind of severe pain associated with cancer or short-term post-operative pain but also for common chronic pain, such as back pain and arthritis. They did this even though they knew that opioids were addictive and subject to abuse, and that their claims regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded.

31.     Defendant saw the profit potential in opioid sales and participated in the unlawful conduct by ignoring Defendant's legal responsibilities, and flooding affected areas, including the Tribe, with opioids while knowing Defendant was contributing to, but profiting from, widespread addiction and human misery. McKesson's willingness to supply whatever quantities of opioids pharmacies ordered and filling prescriptions without scrutiny or hesitation, normalized overprescribing and caused widespread proliferation and availability of these dangerous drugs throughout communities in Alabama, including the Tribe.

---

[47] CDC Guideline, *supra* n. 27.

32.     Defendant succeeded. Opioid abuse has quickly become one of the nation's most pressing health management issues, not only because of its toll on patients, but increasingly because of the financial impact on all the parties involved, including the Tribe.

33.     The manufacturers of opioids and Defendant extracted and continue to extract untold dollars of revenue from the addicted American public, including the Tribe's members, while the Tribe sustains losses caused as a result of the reasonably foreseeable consequences of the prescription opioid addiction epidemic. Defendant knew that but for the Tribe providing at least some aspect of a safety net, the number of overdose deaths and other related health consequences arising from opioid addictions would have even been far greater than actually occurred, and the public outcry and political backlash threatening Defendant's profitmaking activities would have been swifter and far more certain.

34.     The deceptive marketing campaign of the manufacturers of opioids and Defendant substantially contributed to an explosion in the use of opioids across the country, including the Tribe's community. Approximately 20% of the U.S. population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids. Opioids are the most common treatment for chronic pain, and 20% of office visits now include a prescription of an opioid.

35.     The sharp increase in opioid use resulting from Defendant's conduct has led directly to a dramatic increase in opioid abuse, addiction, overdose, and death throughout the United States, including the Tribe. Representing the NIH's National Institute of Drug Abuse in hearings before the Senate Caucus on International Narcotics Control in May 2014, Dr. Nora Volkow explained

that "aggressive marketing by pharmaceutical companies" is "likely to have contributed to the severity of the current prescription drug abuse problem."[48]

36.     In August 2016, then U.S. Surgeon General Vivek Murthy published an open letter to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[49]

37.     In a 2016 report, the CDC explained that "[o]pioid prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[50] Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[51]

38.     Defendant's practice of continually filling opioid prescriptions, including from suspicious prescribers, and failing to report suspicious orders of opioids has enabled an oversupply of opioids to communities, including the Tribe's community. Defendant had financial incentives to distribute higher volumes of opioids and not report suspicious orders or guard against diversion. Wholesale drug distributors acquire pharmaceuticals, including opioids, from manufacturers at an established wholesale acquisition cost. Discounts and rebates from this cost may be offered by

---

[48] *America's Addiction to Opioids: Heroin and Prescription Drug Abuse, U.S.* Senate, Caucus on International Narcotics Control, 113th Cong., at 3 (May 14, 2014) (statement). Testimony of Dr. Nora D. Volkow, Director, National Institute on Drug Abuse, *available at* https://www.hdsl.ord/?abstract&did=754557.

[49] Letter from Vivek H. Murthy, M.D., U.S. Surgeon General, *available at* http://www.tumtheridem.org.

[50] Rose A. Rudd et al., Centers for Disease Control and Prevention, Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014 (Jan. 1, 2016), Morbidity and Mortality Weekly Report, 64(50);1378-82, *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm (hereinafter "2000-2014 Increases in Drug and Opioid Overdose Deaths").

[51] *Id.*

manufacturers based on market share and volume. As a result, higher volumes may decrease the cost per pill to distributors. Decreased cost per pill in turn, allows wholesale distributors to offer more competitive prices, or alternatively, pocket the difference as additional profit.

39.     Further, either explicitly or implicitly, Defendant in this action worked with other opioid producers, manufacturers, distributors, and marketers to stifle the reporting of suspicious orders. This is because even one defection and reporting to the DEA could have reduced the overall quantity of opioids allowed to be dispensed within the United States and to the Tribe. Therefore, to maximize profits, Defendant worked with other opioid producers, manufacturers, marketers, and distributors to ensure the concealment of Defendant's unlawful conduct and thus preserve McKesson's substantial unjust profits.

40.     As the Tribe works to restore the lives of its citizens and communities, the opioid epidemic continues to outpace their efforts.

## C.   Financial Impact of Defendant's Activities on Plaintiff

41.     The Tribe brings this suit against the Defendant for the unlawful distribution of these highly addictive drugs in the area surrounding the Tribe unrelated to, and separate from, any kind of contract that the Defendant may have or has had with the Tribe, and/or with Indian Health Services (IHS), and/or with the federal government. The Tribe makes no claims pursuant to any contract that the Defendant has with IHS and/or the federal government. In addition to participating in the false narrative campaign described below, Defendant unlawfully breached legal duties under Alabama law to monitor, detect, investigate, report, and refuse to fill suspicious orders of prescription opiates, which enabled the manufacturers' deceptive advertising to increase sales, profits and distribution of Defendant's products to communities, including the Tribe's community.

## D.   The Role of Defendant in Causing and Perpetuating the Opioid Crisis

42.     The Defendant's push to increase opioid sales worked. Through publications and websites, endless streams of sales representatives, "education" programs, and other means, Defendant dramatically increased sales of prescription opioids and reaped billions of dollars of profit as a result. Since 1999, the amount of prescription opioids sold in the U.S. has nearly quadrupled. In 2016, 289 million prescriptions for opioids were filled in the U.S. – enough to medicate every adult in America around the clock for a month.

43.     Moreover, the crisis was fueled and sustained by those involved in the supply chain of opioids, including Defendant, who failed to maintain effective controls over the distribution of prescription opioids, and who instead have actively sought to evade such controls. Defendant contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than Defendant knew should be necessary for legitimate medical uses, while failing to report, and failing to take steps to halt, suspicious orders when they were identified, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

44.     Defendant systematically and repeatedly disregarded the health and safety of the public, including the Tribe. Charged by law to monitor and report dangerous behavior, Defendant failed to do so in favor of maximizing corporate profits and increasing Defendant's market share.

45.     For example, in 2017, McKesson agreed to pay a record $150 million civil penalty for alleged violations of the Controlled Substances Act. McKesson admitted to failing to report suspicious orders of pharmaceutical drugs.[52]

---

[52] *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs* (2017)

46.     In 2008, McKesson agreed to pay a $13.5 million civil penalty for similar violations as the ones described above.[53] McKesson admitted to supplying orders of opioids that were unusual in their frequency, size, or other patterns.

47.     In Colorado, from 2008 to 2013, McKesson processed more than 1.6 million orders for controlled substances but only reported a staggering 16 orders as suspicious, all connected to one instance related to a recently terminated customer.[54] David Schiller, a former DEA agent of over thirty years in discussing McKesson's unlawful practices stated "they [McKesson] had hundreds of thousands of suspicious orders they should have reported, and they didn't report any. There's not a day that goes by in the pharmaceutical world, in the McKesson world, in the distribution world, where there's not something suspicious. It happens every day."[55]

48.     Corporate greed and callous indifference to the known, serious potential for human suffering have caused this public health crisis. Defendant unleashed a healthcare crisis that has had far-reaching financial and social consequences in the United States and the Tribe's community, including opioid addiction and death.

## II.   <u>JURISDICTION AND VENUE</u>

49.     This Court has subject matter jurisdiction over the claims made by the Tribe herein pursuant to Section 12-11-30 of the Code of Alabama (1975).

50.     This Court has personal jurisdiction over Defendant in that McKesson conducted business in Alabama at all times material herein, committed acts and/or omissions in or outside Alabama which caused tortious injury to the Tribe, and/or engaged in substantial business activities

---

[53] *Id.*

[54] *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs*, Department of Justice (January 17, 2017), https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders

[55] Bill Whitaker, *Whistleblowers: DEA Attorneys Went Easy on McKesson, The Country's Largest Drug Distributor*, CBS News (December 17, 2017), https://www.cbsnews.com/news/whistleblowers-dea-attorneys-went-easy-on-mckesson-the-countrys-largest-drug-distributor/

in Alabama and purposefully directed Defendant's actions towards Alabama, voluntarily submitted to the jurisdiction of Alabama when obtaining a manufacturer, pharmacy and/or distributor license, and have the requisite minimum contacts with Alabama necessary to constitutionally permit this Court to exercise jurisdiction.

51.     Venue is proper in this Court pursuant to Section 6-3-7 of the Code of Alabama (1975) and Rule 82 of the Alabama Rules of Civil Procedure as many of the acts on which the action is founded occurred in Mobile County, as Defendant conducted business by agent in Mobile County at the time of the accrual of each cause of action.

52.     The Tribe expressly does not bring this action as against  Defendant pursuant to any contract that Defendant has, may have, or has had with the United States Government, its agencies, and/or subdivisions, including but not limited to any contract with the Veterans Administration.

53.     The Tribe does not rely upon or state any claim under or pursuant to, express or implied, as to any federal statutory or regulatory law for any claims, relief, injunctive or otherwise, or causes of action in this Complaint. None of the relief sought herein is or will be inconsistent with any federal law or regulation.

### III.  <u>PARTIES</u>

**A.  Plaintiff**

**The Poarch Band of Creek Indians**

54.     The Poarch Band of Creek Indians (the "Tribe"), is a federally recognized sovereign Indian Tribe in Alabama. The Tribe is governed by the laws of the Poarch Band of Creek Indian Constitution and the laws of the Poarch Band of Creek Indian Tribe, and

exercising inherent governmental authority within the Tribe's Reservation. The Tribe holds a Tribal Chair and Tribal Council of 8 members.

55.    The Tribe is the only federally recognized Indian Tribe in Alabama. The Tribe's Reservation is located in Escambia county, Alabama. The Tribe's members live both on and outside of the Tribe's Reservation. The Tribe and members own properties within multiple counties of Alabama - including, but not limited to, Escambia, Elmore, Montgomery, and Mobile counties. The Tribe has lived on the Tribe's Reservation and/or properties in Alabama ("Tribal Lands"), for almost 200 years.

56.    The Tribe is an active partner in the state of Alabama, contributing to economic, educational, social, and cultural projects benefiting both Tribal members and residents of local communities, neighboring towns, and the state of Alabama.

57.    In Alabama, the Tribe operates both inside and outside of the Tribe's Reservation - including, but not limited to, Florida, Pennsylvania, Nevada, Mississippi, the Caribbean, and various counties within Alabama such as Escambia, Elmore, Montgomery, and Mobile.

58.    Wind Creek Hospitality, a Tribe owned company, owns and operates three casinos on the Reservation; two Greyhound parks in Alabama and Florida; Creek Entertainment Gretna in Florida; two hotel casinos in the Caribbean; Wind Creek Bethlehem in Pennsylvania; and has recently purchased land in D'Iberville, Mississippi for a planned casino development. Wind Creek Hospitality also finances and manages the Wa She Shu Casino in Nevada.

59.    Additionally, the Creek Indian Enterprises Development Authority ("CIEDA") oversees the non-gaming enterprises of the Tribe. The CIEDA owns and

operates ten hotels throughout the United States, the OWA amusement park in Florida, a large retail and restaurant center in Florida, Muskogee Technology, PCI Aviation, Creek Travel Plaza and Diner, two Creek convenience stores, Integrated Federal Solutions, PCI Government Services LLC, PCI Support Services LLC, and Media Fusion LLC.

60.     The Tribe's economy and community spreads across the United States operating as a sovereign Tribe and community.

61.     The Tribe oversees and operates a self-funded health clinic that offers over twenty services and programs.[56] Additionally, the Tribe operates a Family Services Department which promotes the health, social, and emotional well-being of individual Tribe members and their families, as well as for members of other federally-recognized tribes residing within the designated service area for Poarch Band of Creek Indians.[57] This service provides programs such as daycare assistance and protection for tribal children.

62.     A substantial number of the Tribe's citizens have fallen victim to the opioid epidemic, becoming addicted to prescription opioids or coping with family members who are addicted. The Tribe has incurred significant costs in an attempt to abate the opioid epidemic that continues to plague the Tribe's citizens by providing medical services and opioid-related treatments to those in need. The Tribe brings this suit, in part, to recover these costs and procure the additional financial resources required to adequately combat and abate opioid addiction, opioid-related injuries, and other problems caused by the opioid crisis.

63.     This action is brought by the Tribe in the exercise of its authority as a sovereign government and on behalf of the Tribe in its proprietary capacity and under its *parens patriae* authority in the public interest to protect the health, safety, and welfare of all of the Tribe's citizens

---

[56] http://pci-nsn.gov/wordpress/services/health-elder-services/health-department/
[57] http://pci-nsn.gov/wordpress/services/tribal-member-services/family-services-department/

as well as the non-tribal member inhabitants of their Tribal Lands and to stop the growing prescription opioid epidemic within the Tribe. The Tribe also brings this action to recover damages and seek other redresses for harm caused by Defendant's improper, wrongful, fraudulent, and tortious conduct with respect to the distribution of prescription opioids. Defendant's actions have caused, and continue to cause, a crisis that threatens the health, safety, and welfare of the Tribe.

64.     The Tribe brings this action to recover opioid-related expenses, as well as to halt the reprehensible and tortious conduct of Defendant and the results of that conduct, and to cause Defendant to disgorge McKesson's profits earned improperly from Defendant's unlawful conduct, and to permit a Mobile County jury to determine whether Defendant should be punished for Defendant's unlawful conduct.

## B.  Defendant

### McKesson Corporation

65.     Defendant McKesson Corporation ("McKesson"), among other opioid distributors' are responsible for 85% to 90% of the prescription opioids that are distributed in the United States, including to the area surrounding the Tribe.  At all relevant times, Defendant distributed, supplied, sold, and placed into the stream of commerce prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes. Defendant universally failed to comply with Alabama law. Defendant is a "Wholesale Drug Distributor" as defined under Alabama law and must "operate in compliance with applicable … State and Municipal laws and regulations." Ala. Admin. Code r.680-X-2-.23. The Tribe alleges that the unlawful conduct by Defendant is a substantial cause for the volume of prescription opioids plaguing the Tribe's community.

66.     The McKesson Corporation is registered with the Alabama Secretary of State as a company incorporated under the laws of Delaware with its principal place of business in Dover, Delaware. McKesson's registered agent in the State of Alabama can be served at 641 South Lawrence Street, Montgomery, AL 36104.

67.     McKesson is the largest pharmaceutical distributor in North America; it delivers approximately one-third of all pharmaceuticals used in North America. McKesson distributed more opioid doses in Mobile County between 2006 and 2012 than any other opioid distributor. McKesson conducts business in the state of Alabama by distributing prescription opioids to hospitals, retail pharmacies, practitioners, mid-level practitioners, primary care providers, and teaching institutions. McKesson is subject to state reporting obligations with respect to the distribution of controlled substances in the state of Alabama. ALA. CODE §§20-2-1 *et seq.*

68.     All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendant's officers, agents, employees, or other representatives while actively engaged in the management of Defendant's affairs within the course and scope of their duties and employment, and/or with Defendant's actual, apparent, and/or ostensible authority.

69.     The true names and capacities, whether individual, corporate, associate, or otherwise of certain vendors, distributors and/or their alter egos, sued herein as DOES 1 through 100 inclusive, are presently unknown to Plaintiff, who therefore sue these Defendants' by fictitious names. Plaintiff will seek leave of this Court to amend this Complaint to show their true names and capacities when they become ascertained. Each of the Doe Defendants' has taken part in and participated with, and/or aided and abetted,

Defendant in some or all of the matters referred to herein, and therefore are liable for the same.

## IV.   FACTUAL BACKGROUND

### A.  The History of Opioids

70.     The synthetic opioids distributed by Defendant are related to the opium poppy, which has been used to relieve pain for centuries.

71.     The opium poppy was a well-known symbol of the Roman Civilization, which signified both sleep and death. The Romans used opium not only as a medicine but also as a poison.[58]

72.     During the Civil War, opioids, then known as "tinctures of laudanum," gained popularity among doctors and pharmacists for their ability to reduce anxiety and relieve pain on the battlefield. They were also used in a wide variety of commercial products ranging from pain elixirs to cough suppressants to beverages.

73.     Alabama law imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally have been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence; Schedule III drugs are deemed to have a lower potential for abuse, but their abuse may lead to moderate or low physical dependence or high psychological dependence. ALA. CODE §§ 20-2-24 - 25 (1975).

74.     The effects of opioids vary by duration. Long-acting opioids are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in

---

[58] Martin Booth, *Opioids: A History,* at 20 (Simon & Schuster Ltd. 1996).

general, 12 hours. Short-acting opioids are designed to be taken in addition to long-acting opioids to address "episodic pain" (also referred to as "breakthrough pain") and provide fast-acting, supplemental opioid therapy lasting approximately 4 to 6 hours. Still other short-term opioids are designed to be taken in addition to long-acting opioids to specifically address breakthrough cancer pain, excruciating pain suffered by some patients with end-stage cancer. Opioid marketers' promoted the idea that pain should be treated by taking long-acting opioids continuously and supplementing them by also taking short-acting, rapid-onset opioids for episodic or "breakthrough" pain.

75.    Patients develop tolerance to the analgesic effect of opioids relatively quickly. As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction. The same is true of the euphoric effects of opioids – the "high." However, opioids depress respiration, and at very high doses can and often do arrest respiration altogether. At higher doses, the effects of withdrawal are more severe. Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

76.    Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

77.    Opioids provide effective treatment for short-term, post-surgical and trauma-related pain, and for palliative end-of-life care. They are approved by the FDA for use in the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days. Defendant, however, distributed opioids for the management of chronic pain by misleading consumers

and medical providers through misrepresentations or omissions regarding the appropriate uses, risks, and safety of opioids.

78. As one doctor put it, the widespread, long-term use of opioids "was an experiment on the population of the United States. It wasn't randomized, it wasn't controlled, and no data was collected until they started gathering death statistics."

## B. The Opioid Epidemic in the Indian Country and United States

79. Prescription opioids have become widely prescribed. In 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[59]

80. Despite the enormous number of prescriptions, recent studies have concluded that treatment with opioids is not superior to treatment with non-opioid medications for improving pain-related function.[60] Even for patients presenting to the emergency room with acute extremity pain, there is no significant or clinically important difference in pain reduction at 2 hours among single-dose treatment with ibuprofen and acetaminophen or with three different opioid and acetaminophen combination analgesics.[61]

81. In 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention, declared prescription painkiller overdoses at epidemic levels. The News Release noted:

[59] Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States,* 104 Am. J. Pub. Health e52-e59 (2014), https://www.nebi.nlm.nih.gov/pme/articles/PMC3935688/.
[60] Erin E. Krebs, M.D., et al., *Effect of Opioid vs Nonopioid Medications on Pain-Related Function in Patients with Chronic Back Pain or Hip or Knee Osteoarthritis Pain,* 319 JAMA 872-882 (2018), doi: 10.1001/jama.2018.0899, https://jamanetwork.com/journals/jama/article-abstract/2673971?redirect=true.
[61] Andrew K. Chang, M.D., et al., *Effect of a Single Dose of Oral Opioid and Nonopioid Analgesics on Acute Extremity Pain in the Emergency Department,* 318 JAMA 1661-1667 (2017), DOI: 10.1001/jama.2017.16190, https://jamanetwork.com/journals/jama/article-abstract/2661581?widget=personalizedcontent& previousarticle=2673971&redirect=true.

a.    The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

b.    More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

c.    Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

d.    The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older – a total of 12 million people – reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

e.    Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

f.    Almost 5,500 people start to misuse prescription painkillers every day.[62]

82.    The CDC has also identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers – which, at the molecular level and in their effect, closely resemble heroin – are forty times more likely to be addicted to heroin.[63] According to a recent study, among young urban heroin users, 86% used opioid pain relievers prior to using heroin.[64]

---

[62] *See* Press Release, Centers for Disease Control and Prevention, Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/mediairreleases/2011/p1101_flu_pain_killer_overdose.html.
[63] *See* Centers for Disease Control and Prevention, *Today's Heroin Epidemic*, https://www.cdc.gov/vitalsigns/heroin/index.html.
[64] Nat'l Inst. on Drug Abuse, *Prescription Opioids and Heroin* (Jan. 2018), https://d14rmgtrwzf5a.cloudfront.net/sites/default/files/19774-prescription-opioids-and-heroin.pdf.

83.     The synthetic opioid fentanyl has been a driving force behind the nation's opioid epidemic, killing tens of thousands of Americans in overdoses. The drug is so powerful that it is now being used to execute prisoners on death row.[65]

84.     The U.S. opioid epidemic is continuing, and drug overdose deaths nearly tripled during 1999-2014. Among the 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.[66]

85.     The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.[67]

86.     The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[68]   The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.[69]

87.     This Complaint expressly does not involve the Defendant's actions associated with fulfilling a PPV contract with the Tribe or with IHS or with the federal government. This Complaint alleges damages that stem from Defendant's actions that flooded the Alabama and Florida counties and cities in the geographic area outside the Tribe's reservation and/or boundaries, with an irresponsible, unnecessary, and unjustifiable amount of opioids which lead to addiction in the

---

[65] Mitch Smith, *Fentanyl Used to Execute Nebraska Inmate, in First for U.S.,* (Aug. 14, 2018), https://www.nytimes.com/2018/08/14/us/carey-dean-moore-nebraska-execution-fentanyl.html.
[66] *Id.*
[67] *See* Nora D. Volkow, M.D. & A. Thomas McLellan, M.D., *Opioid Abuse in Chronic Pain –Misconceptions and Mitigation Strategies,* 374 N Eng. J. Med. 1253-1263 (2016), DOI: 10.1056/NEJMra1507771, http://www.nejm.org/doi/full/10.1056/NEJMra1507771, (hereinafter "Volkow & McLellan").
[68] *Id.*
[69] *Id.* (citing at note 2, Florence CS, et al., *The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013* (Oct. 2016), 54 Med. Care 901-906 (2016),
DOI: 10.1097/ML R.0000000000000625, *available at* https://www.ncbi.nlm.nih.gov/pubmed/27623005.

Tribe's communities and the other damages detailed herein. But for the Defendant's willingness to supply high quantities of opioids and to fill prescriptions without scrutiny or hesitation, the widespread proliferation and availability of these dangerous drugs throughout communities in Alabama and Florida, including the geographic area surrounding the Tribe would not have occurred.

88.    From 2006 to 2014, Defendant and other opioid distributors' distributed a total of 25,546,863 dosage units of opioid into Escambia County, Alabama.[70] McKesson was and remains to be considered a top distributor for opioids in Escambia County, Alabama.[71]

89.    From 2006 to 2014, Defendant and other opioid distributors' distributed a total of 33,475,004 dosage units of opioid products into Covington, Alabama.[72] McKesson was and remains to be considered a top distributor for opioids in  Covington County, Alabama.[73]

90.    From 2006 to 2014, Defendant and other opioid distributors' distributed a total of 37,946,870 dosage units of opioid products into Elmore County, Alabama. [74] Defendant was and remains to be considered a top distributor for opioids in Elmore County, Alabama.[75]

91.    From 2006 to 2014, Defendant and other opioid distributors' distributed a total of 100,718,322 dosage units of opioid products into Montgomery County, Alabama.[76] McKesson was and remains to be labeled as a top distributor for opioid products in Montgomery County, Alabama.[77]

---

[70] *Opioid Data,* Securities Litigation & Consulting Group (2020) (Raw opioid data made available by Judge Polster through the publication order of ARCOS data covering opioid shipments from 2006 to 2014).
[71] *Id*.
[72] *Id*.
[73] *Id*.
[74] *Id*.
[75] *Id*.
[76] *Id*.
[77] *Id.*

92.     From 2006 to 2014, Defendant and other opioid distributors' distributed a total of 121,521,521 dosage units of opioid products into Baldwin County, Alabama.[78] McKesson was and remains to be labeled as a top distributor for opioid products in Baldwin County, Alabama.[79]

93.     From 2006 to 2014, Defendant and other opioid distributors' distributed a total of 266,436,359 dosage units of opioid products into Mobile County, Alabama.[80] In those same years, McKesson was the number one distributor for opioid products in all of Mobile County, Alabama.[81]

94.     From 2006 to 2014, Defendant and other opioid distributors' supplied approximately a total of 585,173073 dosage units of opioid products into the geographic area surrounding the Tribe's land including Baldwin, Escambia, Covington, Elmore, Mobile, and Montgomery Counties.[82] McKesson has and remains the number one distributor of opioid products into Baldwin, Elmore, Escambia, Covington, Mobile, and Montgomery Counties.

## V.   DEFENDANT THROUGHOUT THE SUPPLY CHAIN DELIBERATELY DISREGARDED DEFENDANT'S DUTIES TO MAINTAIN EFFECTIVE CONTROLS AND TO IDENTIFY, REPORT, AND TAKE STEPS TO HALT SUSPICIOUS ORDERS

95.     Wholesale drug distributors such as Defendant, may not operate in any way that endangers the public health. Ala. Admin. Code r.680-X-2-.23. Additionally, "[t]he Alabama Legislature hereby finds that the diversion, abuse, and misuse of prescription medications classified as controlled substances under the Alabama Uniform Controlled Substances Act constitutes a serious threat to the health and welfare of the citizens of the State of Alabama." ALA. CODE § 20-2-210.

96.     The manufacturers of opioids created a vastly and dangerously larger market for

---

[78]  *Opioid Data, supra* n.74.
[79] *Id.*
[80]  *Opioid Data, supra* n.74.
[81] *Id.*
[82] *Id.*

opioids. Defendant compounded this harm by facilitating the supply of far more opioids than could have been justified to serve that market.  The failure by Defendant to maintain effective controls, and to investigate, report, and take steps to halt orders that the Defendant knew or should have known were suspicious breached Defendant's Alabama state statutory and common law duties.

97.    The manufacturers of opioids' schemes were resoundingly successful. Chronic opioid therapy – the prescribing of opioids long-term to treat chronic pain – has become commonplace, and often first-line, treatment. The manufacturers of opioids deceptive marketing caused prescribing not only of their opioids, but also of opioids as a class, to skyrocket. According to the CDC, opioid prescriptions, as measured by the number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S. While previously a small minority of opioid sales, today between 80% and 90% of opioids (measured by weight) used are for chronic pain. Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids. Defendant enjoyed the successful schemes as the schemes allowed the Defendant to over distribute opioids in Alabama, including the Tribe.

98.    More specifically, McKesson distributed more than 18% of the nation's opioids from 2006 to 2012—the most of any distribution company.[83]

99.    In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[84] Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to

---

[83] Geoff Mulvihill and Matthew Perrone, *Data show many companies contributed to US opioid crisis,* AP News (July 17, 2019) https://apnews.com/98963bb70e0f462295ccc02fe9c68e71.
[84] 2000-2014 Increases in Drug and Opioid Overdose Deaths, *supra* n. 46.

reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[85]

## A.  Defendant Has, and Breached, Duties to Guard Against, and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders

100.    Multiple sources impose duties on Defendant with respect to the supply of opioids, including the Alabama common law duty to exercise reasonable care.

101.    Defendant was and continues to be required to register with the Alabama Board of Pharmacy and certify compliance with Alabama law. The "Alabama Uniform Controlled Substances Act," ALA. CODE §§ 20-2-1 *et seq.* provides, *inter alia*, that anyone who "manufactures, distributes, or dispenses" any controlled substance in Alabama must obtain a registration annually issued by the certifying boards. § 20-2-51(a). Such registrants must abide by the terms of their issued registration and act "in conformity with the other provisions of this article". § 20-2-51(b). ALA. CODE §§ 20-2-56 requires registrants to maintain records in conformity with requirements of applicable law and "with any additional rules issued by the State Board of Medical Examiners, the State Board of Health, or the State Board of Pharmacy." ALA. CODE  §§ 20-2-210 through 220 created the "Controlled Substances Prescription Database" and imposes mandatory reporting requirements on registrants.

102.    Defendant also had legal duties under Alabama common law, statutes and regulations to maintain adequate records, and prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids. This includes the common law of fraud and statutes designed to generally prohibit unfair and deceptive acts in commerce, as well as statutes specifically prohibiting deceptive practice relating to drugs. The Alabama Administration Code Rule 680-X-2-.23 requires distributors "to establish and maintain inventories and records of all transactions regarding the receipt and distribution or other disposition of drugs," to forward to the

---

[85] *Id.*

Board of Pharmacy "[c]opies of records and reports required by the [DEA] concerning increases in purchases or high or unusual volumes purchased by pharmacies," and to comply with "applicable … state and municipal laws and regulations." Ala. Admin. Code r.680-X-2-.23 . Additionally, the Alabama Administration  Code Rule 680-X-3-.05 requires "[a]ny manufacturer, wholesaler or distributor of controlled substances doing business in the State of Alabama" to "submit to the Alabama State Board of Pharmacy legible copies of records and reports required by the Drug Enforcement Administration concerning increases in purchases or high or unusual volumes purchased by pharmacies within 30 days." Ala. Admin. Code r. 680-X-3-.05.

103.    In addition to reporting all suspicious orders, Defendant must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the recipient can determine that the order is not likely to be diverted into illegal channels. Regardless, all flagged orders must be reported.

104.    These prescription drugs are regulated for the purpose of providing a closed system intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.

105.    "Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities."[86]

---

[86] Brief for Healthcare Distribution Mgmt. Association and National Ass'n of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *22 (hereinafter "Brief for HDMA and NACDS"). The Healthcare Distribution Mgmt. Ass'n (HDMA or HMA) – now known as the Healthcare Distribution Alliance (HDA) – is a national, not-for-profit trade association that represents the nation's primary, full-service healthcare distributors. *See generally* HDA, *About*, https://www.healthcaredistribution.org/about. The National Association of Chain Drug Stores (NACDS) is a national, not-for-profit trade association that represents traditional drug stores and supermarkets and mass merchants with pharmacies. *See generally* NACDS, *Mission*, https://www.nacds.org/%20about/mission/.

106.    The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and the subsequent plague of opioid addiction with costs and damages necessarily inflicted on and incurred by the Tribe.

107.    The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality, along with the costs imposed upon the Tribe and other related health consequences caused by opioid abuse.

108.    Finding it impossible to legally achieve Defendant's ever-increasing sales ambitions, the Defendant engaged in the common purpose of increasing the supply of opioids and fraudulently increasing the quotas that governed the distribution of Defendant's prescription opioids.

109.    Wholesale distributors such as Defendant had close financial relationships with both the manufacturers of opioids and customers, for whom Defendant provided a broad range of value-added services that render the Defendant uniquely positioned to obtain information and control against diversion. These services often otherwise would not be provided by manufacturers or distributors to their dispensing customers and would be difficult and costly for the dispenser to reproduce. Through Defendant's generic source programs, Defendant and other wholesalers are also able "to combine the purchase volumes of customers and negotiate the cost of goods with manufacturers." Wholesalers typically also offer marketing programs, patient services, and other software to assist their dispensing customers.

110.    Defendant had financial incentives from the manufacturers of opioids to distribute higher volumes and thus to refrain from reporting or declining to fill suspicious orders. Wholesale drug distributors, including Defendant, acquire pharmaceuticals, including opioids, from manufacturers at an established wholesale acquisition cost. Opioid manufacturers may offer

discounts and rebates from this cost based on market share and volume. As a result, higher volumes may decrease the cost per pill to opioid distributors. Decreased cost per pill, in turn, allows wholesale distributors, such as Defendant to offer more competitive prices, or alternatively, pocket the difference as additional profit. Either way, the increased sales volumes result in increased profits for Defendant.

111.    Manufacturers of opioids often engaged in the practice of paying rebates and/or chargebacks to Defendant for sales of prescription opioids as a way to help manufacturers and distributors boost sales and better target their marketing efforts. The Washington Post has described the practice as industry-wide, and the Healthcare Distribution Alliance ("HDA") includes a "Contracts and Chargebacks Working Group," suggesting a standard practice. The transaction information contains data relating to the direct customer sales of controlled substances to "downstream registrants", meaning pharmacies or other dispensaries. Manufacturers of opioids buy data from pharmacies as well. This exchange of information, upon information and belief, would have opened channels providing for the exchange of information revealing suspicious orders as well.

112.    A dramatic example of the use of prescription information provided by IMS Health was described in Congressional testimony:

> Mr. Greenwood: Well, why do you want that [IMS Health] information then?
>
> Mr. Friedman: Well, we use that information to understand what is happening in terms of the development of use of our product in any area.
>
> Mr. Greenwood. And so the use of it–and I assume that part of it–a large part of it you want is to see how successful your marketing techniques are so that you can expend money in a particular region or among a particular group of physicians–you look to see if your marketing practices are increased in sales. And, if not, you go back to the drawing board with your marketers and say, how come we spent "X" number of dollars, according to these physicians, and sales haven't responded. You do that kind of thing. Right?

Mr. Friedman: Sure.

113.    The contractual relationships among the manufacturers of opioids and Defendant also include vault security programs. Defendant is required to maintain certain security protocols and storage facilities for the distribution of the Defendant's opiates. Defendant negotiated agreements whereby the manufacturers of opioids installed security vaults for Defendant in exchange for agreements to maintain minimum sales performance thresholds. Defendant used these agreements as a tool to violate Defendant's reporting and diversion duties in order to reach the required sales requirements.

### 1.    Defendant's Use of Trade and Other Organizations

114.    In addition, the manufacturers of opioids and Defendant worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum ("PCF") and the Healthcare Distribution Alliance ("HDA").

### a.    Pain Care Forum

115.    PCF has been described as a coalition of drug-makers, trade groups, and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped government policies regarding the use of prescription opioids for more than a decade.

116.    The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drug-makers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[87]  Specifically, PCF members spent over $740

---

[87] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (Sept. 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic. (emphasis added).

million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[88]

117.   Defendant stood to profit from expanded prescription opioid use is a member of and/or participant in the PCF.[89] Defendant actively participated, and continues to participate, in the PCF through, at a minimum, their trade organization, the HDA.[90] Upon information and belief, Defendant participated directly in the PCF as well.

### b.   Healthcare Distribution Alliance

118.   The HDA led to the formation of interpersonal relationships and an organization among Defendant and other distributors. Although the entire HDA membership directory is private, the HDA website confirms that Defendant and the manufacturers of opioids were members of the HDA.[91] Additionally, the HDA and Defendant eagerly sought the active membership and participation of the manufacturers of opioids by advocating for the many benefits of members including "strengthening . . . alliances."[92]

119.   Beyond strengthening alliances, the benefits of HDA membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "network with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make

---

[88] *Id*.
[89]   *PAIN    CARE    FORUM    2012    Meetings    Schedule*,    (last    updated    Dec.    2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf.
[90] *Id*. The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc. and the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation. *Executive Committee*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/about/executive-committee%20.
[91] *Manufacturer Membership*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/about/membership/manufacturer.
[92] *Id*.

connections."[93] The HDA and Defendant used membership in the HDA as an opportunity to create interpersonal and ongoing organizational relationships and "alliances" between the manufacturers of opioids and Defendant.

120.    The HDA application requests that the manufacturer identify its current distribution information, including the facility name and contact information. Manufacturer members were also asked to identify their "most recent year-end net sales" through wholesale distributors.

121.    The closed meetings of the HDA's councils, committees, task forces and working groups provided the manufacturers of opioids and Defendant with the opportunity to work closely together, confidentially, to develop and further the common purpose and interests of the enterprise.

122.    The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA and Defendant advertise these conferences to the manufacturers of opioids as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[94]   The conferences also gave the manufacturers of opioids and Defendant "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[95]   The HDA and its conferences were significant opportunities for the manufacturers of opioids and Defendant to interact at a high-level of leadership.    The manufacturers of opioids embraced this opportunity by attending and sponsoring these events.[96]

123.    After becoming a members of the HDA, Defendant and other opioid distributors' were eligible to participate on councils, committees, task forces and working groups, including:

---

[93] *Id.*
[94] *Business and Leadership Conference – Information for Manufacturers*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/events/2015-business-and- leadership-conference/blc-for-manufacturers (last visited Aug. 1, 2018, and no longer available).
[95] *Id.*
[96] *2015 Distribution Management Conference and Expo*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/events/2015-distribution-management-conference.

a.   Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."

b.   Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes distributor and manufacturer members.

c.   Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributor and manufacturer members.

d.   Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation in this group includes manufacturer and distributor members.

124.   Defendant and manufacturers of opioids also participated, through the HDA, in Webinars and other meetings designed to exchange detailed information regarding their prescription opioid sales, including purchase orders, acknowledgments, ship notices, and invoices.[97] For example, on April 27, 2011, the HDA offered a Webinar to "accurately and effectively exchange business transactions between distributors and manufacturers…". The manufacturers of opioids used this information to gather high-level data regarding overall distribution and to direct Defendant on how to sell prescription opioids most effectively.

---

[97] *Webinars*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

125.    Taken together, the interaction and length of the relationships between and among the manufacturers of opioids and Defendant reflect a deep level of interaction and cooperation between two groups in a tightly knit industry.

126.    The HDA and the Pain Care Forum are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrates that the leaders of the Defendant and other opioid entities were in communication and cooperation.

127.    Defendant also worked together with other opioid producers, manufacturers, and marketers to ensure that the Aggregate Production Quotas, Individual Quotas, and Procurement Quotas remained artificially high.  In so doing, Defendant and other opioid entities ensured that suspicious orders were not reported, and, further, in so doing, Defendant and other opioid entities ensured that there was no basis for either refusing to increase production quotas or decreasing production quotas due to diversion.

128.    Defendant also had reciprocal obligations to report suspicious orders of other parties if they became aware of them. Defendant was responsible for other opioid entities compliance with reporting obligations.

129.    Defendant thus knew that other distributors could report Defendant's own conduct and that McKesson's failure to report suspicious orders Defendant filled could be brought to the state of Alabama's attention. As a result, Defendant had an incentive to communicate with other distributors about the reporting of suspicious orders to ensure consistency in their dealings with the state of Alabama.

130.    The desired consistency was achieved. As described below, Defendant failed to report suspicious orders and the flow of opioids continued unimpeded.

**2.      Defendant Was Aware of and Has Acknowledged Defendant's Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders**

131.     The reason for the reporting rules is to create a closed system intended to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control. Both because distributors handle such large volumes of controlled substances, and because they are uniquely positioned, based on their knowledge of their customers and orders, as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical.  Should a distributor deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses.

132.     The Defendant was well aware that Defendant had an important role to play in this system, and also knew or should have known that Defendant's failure to comply with their own obligations would have serious consequences.

### 3.     Defendant Kept Careful Track of Prescribing Data and Knew About Suspicious Orders and Prescribers

133.     Under the Alabama Code, opioid distributors such as Defendant, must maintain records and comply with all applicable statutes, rules, or regulations. ALA. CODE § 20-2-56, -57.

134.     The data that reveals and/or confirms the identity of each wrongful opioid distributor, including Defendant is hidden from public view in the DEA's Confidential Automation of Reports and Consolidated Orders System (ARCOS) database. The data necessary to identify with specificity the transactions that were suspicious is in possession of Defendant and the manufacturers of opioids but has recently been disclosed to the public made available by Judge

Polster and his publication order of ARCOS data covering raw opioid shipments from 2006 to 2014.

135.    Publicly available information confirms that Defendant and manufacturers of opioids funneled far more opioids into Alabama, including the Tribe, than could have been expected to serve legitimate medical use and ignored other red flags of suspicious orders. This information, along with the information known only to Defendant and the manufacturers of opioids, would have alerted them to potentially suspicious orders of opioids.

136.    This information includes the following facts:

a.      distributors have access to detailed transaction-level data on the sale and distribution of opioids, which can be broken down by zip code, prescriber, and pharmacy and includes the volume of opioids, dose, and the distribution of other controlled and non-controlled substances;

b.      Defendant plays such a large part in the distribution of opioids that its own volume provides a ready vehicle for measuring the overall flow of opioids into a pharmacy or geographic area; and

c.      Defendant and other opioid distributors sold chargeback data to the manufacturers of in return for discounts that allowed the Defendant and other opioid distributors to monitor the combined flow of opioids into a pharmacy or geographic area, including the Tribe.

137.    The conclusion that Defendant was on notice of the problems of abuse and diversion follows inescapably from the fact that Defendant flooded communities, including the Tribe's, with opioids in quantities that Defendant knew or should have known exceeded any legitimate market for opioids-even the wider market for chronic pain.

138.    At all relevant times, Defendant was in possession of national, regional, state, and local prescriber-and patient-level data that allowed Defendant to track prescribing patterns over time. Defendant obtained this information from data companies, including but not limited to: IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS

41

Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").

139.    Defendant developed questionnaires and files that were intended to help the Defendant identify suspicious orders or customers who were likely to divert prescription opioids.[98] The questionnaires informed Defendant of the number of pills that the pharmacies sold, how many non-controlled substances were sold compared to controlled substances, whether the pharmacy purchased opioids from other distributors, and the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, and others. These questionnaires put the recipients on notice of suspicious orders.

140.    Defendant purchased nationwide, regional, state, and local prescriber- and patient-level data from the Data Vendors that allowed Defendant to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify pill mills, etc. The Data Vendors' information purchased by Defendant allowed the Defendant to view, analyze, compute, and track Defendant's competitors' sales, and to compare and analyze market share information.[99]

141.    IMS Health, for example, provided Defendant with reports detailing prescriber behavior and the number of prescriptions written between competing products.[100]

---

[98] U.S. Dep't of Justice Drug Enforcement Administration, *Suggested Questions a Distributor should ask prior to shipping controlled substances.*
https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf; Richard Widup, Jr., Kathleen H. Dooley, Esq. *Pharmaceutical Product Diversion: Beyond the PDMA*, Purdue Pharma and McGuireWoods LLC, https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf.

[99] A Verispan representative testified that Defendant and other opioid distributors' use the prescribing information to "drive market share." *Sorrell v. IMS Health Inc.*, 2011 WL 661712, *9-10 (Feb. 22, 2011).

[100] Paul Kallukaran & Jerry Kagan, *Data Mining at IMS HEALTH: How we Turned a Mountain of Data into a Few Information-rich Molehills*,
http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.198.349&rep=rep1&type=pdf, Figure 2 at p. 3.

142. Similarly, Wolters Kluwer, an entity that eventually owned data mining companies that were created by another opioid distributor provided the Defendant with charts analyzing the weekly prescribing patterns of multiple physicians, organized by territory, regarding competing drugs and analyzed the market share of those drugs.[101]

143. This information allowed the Defendant to track and identify instances of overprescribing. In fact, one of the Data Vendors' experts testified that the Data Vendors' information could be used to track, identify, report and halt suspicious orders of controlled substances.[102] The Defendant was, therefore, aware of the suspicious orders that flowed from the Defendant's facilities.

### 4. Defendant Failed to Report Suspicious Orders or Otherwise Act to Prevent Diversion

144. As discussed above, the Defendant failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into Alabama including the Tribe's community. Despite the notice described above, Defendant continued to pump massive quantities of opioids into communities in disregard of Defendant's legal duties to control the supply, prevent diversion, and report and take steps to halt suspicious orders.

145. Defendant admitted to disregarding its duties. Defendant has admitted that it pumped massive quantities of opioids into communities around the country, including Indian Country despite Defendant's obligations to control the supply, prevent diversions, and report and take steps to halt suspicious orders.

---

[101] *Sorrell v. IMS Health Inc.*, 2011 WL 705207, at *467-471 (Feb. 22, 2011).

[102] In *Sorrell*, expert Eugene "Mick" Kolassa testified, on behalf of the Data Vender, that "a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be prescribing an inordinately high number of prescriptions for their product." *Id*; *see also* Joint Appendix in *Sorrell v. IMS Health*, 2011 WL 687134, at *204 (Feb. 22, 2011).

146.    Defendant was repeatedly admonished and even fined by regulatory authorities but continued to disregard Defendant's obligations to control the supply chain of dangerous opioids and to institute controls to prevent diversion.

**5.   Defendant Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement**

147.    When a distributor does not report or stop suspicious orders, prescriptions for controlled substances may be written and dispensed to individuals who abuse them or who sell them to others to abuse. This, in turn, fuels and expands the illegal market and results in opioid-related overdoses. Without reporting by those involved in the supply chain, law enforcement may be delayed in taking action – or may not know to take action at all.

148.    After being caught failing to comply with particular obligations at particular facilities, Defendant made broad promises to change McKesson's ways and insisted that Defendant sought to be good corporate citizens.

149.    For example, McKesson boasts the corporations position on detection and prevention by stating "[a]t McKesson, we take our role in helping to protect the safety and integrity of the pharmaceutical supply chain extremely seriously … we enhanced our teams, processes and technologies dedicated to preventing diversion. We are committed to maintaining – and continuously enhancing – strong programs designed to detect and prevent opioid diversion within the pharmaceutical supply chain."[103]

150.    More generally, Defendant publicly portrayed the McKesson Corporation as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs.

---

[103]   *Opioid Abuse – Fighting the Epidemic,* McKesson Corporation (October 21, 2019) https://www.mckesson.com/About-McKesson/Fighting-Opioid-Abuse/.

151.   In furtherance of Defendant's and other opioid entities effort to affirmatively conceal Defendant's conduct and avoid detection, Defendant and other opioid entities, through trade associations, HDMA and NACDS, filed an amicus brief in *Masters Pharmaceuticals*, which made the following statements:[104]

      a.      "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs but undertake such efforts as responsible members of society."

      b.      "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process."

152.   Through the above statements made on Defendant's and other opioid entities behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, the Defendant not only acknowledged that McKesson understood corporate obligations under the law, but Defendant further asserted that McKesson's conduct complied with those obligations.

153.   Public statements by Defendant created the false and misleading impression to regulators, prescribers, and the public that Defendant rigorously carried out its legal duties, including Defendant's duty to report suspicious orders and exercise due diligence to prevent diversion of these dangerous drugs, and further created the false impression that Defendant also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities McKesson's business practices would necessarily impact.

## A.   Defendant's Unlawful Distribution of Opioids

---

[104] Brief for HDMA and NACDS, 2016 WL 1321983, at *3-4, *25.

154.    Defendant owes a duty under, *inter alia*, Alabama common law and statutory law, to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids as well as those orders which Defendant knew or should have known were likely to be diverted.

155.    The foreseeable harm from a breach of these duties was the medical, social, and financial consequences rippling through society, arising from the abuse of diverted opioids for nonmedical purposes.

156.    Defendant repeatedly and purposefully breached its duties under Alabama law. Such breaches are direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes, with the resultant medical and financial damages to the Tribe.

157.    For over a decade, Defendant aggressively sought to bolster revenue, increase profit, and grow Defendant's share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids sold. However, Defendant is not permitted to engage in a limitless expansion of Defendant's sales through the unlawful sales of regulated painkillers. Rather, as described below, Defendant is subject to various duties to report the quantity of Schedule I and II controlled substances in order to monitor such substances and prevent oversupply and diversion into the illicit market. ALA. CODE § 20-2-23, -25 (1975).

158.    The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality, with social and financial costs borne by, among others, the Tribe.

159.    Defendant intentionally continued unlawful conduct, as alleged herein, with the knowledge that such conduct was creating the opioid epidemic and causing the damages alleged herein.

160.    "Suspicious orders" include orders of an unusual size, orders of unusual frequency, or orders deviating substantially from a normal pattern. These criteria are disjunctive and are not all-inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter, and the order should be reported as suspicious. Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.

161.    In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels. Regardless, all flagged orders must be reported.

162.    These prescription drugs are regulated for the purpose of providing a "closed" system intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.

163.    Because distributors are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on them to maintain effective controls to prevent diversion of controlled substances.

164.    Defendant and other opioid distributors have admitted that they are responsible for reporting suspicious orders.

165.    Defendant and other opioid distributors admit that opioid distributors "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs but undertake such efforts as responsible members of society."[105]

166.    Defendant knew McKesson was required to monitor, detect, and halt suspicious orders. Industry compliance guidelines established by the Healthcare Distribution Management Association (now known as the HDA, a front group of the Defendant and other opioid entities, discussed below), the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers." The guidelines set forth recommended steps in the "due diligence" process, and note in particular: If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest.[106]

167.    Defendant sold prescription opioids, including hydrocodone and/or oxycodone, to retailers from which Defendant knew prescription opioids were likely to be diverted.

---

[105] *See* Amicus Curiae Brief of Healthcare Distribution Mgmt. Ass'n in Support of App. Cardinal Health, Inc., *Cardinal Health, Inc. v. U.S. Dep't of Justice*, No. 12- 5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *10 (hereinafter "Brief of HDMA in Support of Cardinal").

[106] Healthcare Distribution Mgmt. Ass'n (HDMA) *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances*, *filed in Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

168.     Defendant owes a duty to monitor, detect and refuse suspicious orders of prescription opioids, to report suspicious orders of prescription opioids and to prevent the diversion of prescription opioids into illicit markets.

169.     The laws at issue here concerning the sale and distribution of controlled substances are also the public safety statutes and regulations of Alabama.

170.     Defendant's violations of public safety statutes constitute *prima facie* evidence of negligence under Alabama state law.

171.     The unlawful conduct by Defendant is purposeful and intentional. Defendant refused to abide by the duties imposed by Alabama state law, which are required to legally acquire and maintain a license to distribute prescription opiates.

172.     Defendant acted with actual malice in breaching Defendant's duties, i.e., Defendant has acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

### 1.1    Inadequate Compliance Staffing and Training

173.     First, Defendant routinely failed to staff Defendant's compliance functions with qualified personnel and failed to provide those compliance employees and Defendant's sales representatives with appropriate training. Even front-line compliance functions, such as approving threshold increases, detecting, blocking, and reporting suspicious orders, and terminating and/or suspending customers, were often assigned to operations, sales and administrative employees who had no experience with regulatory compliance of any kind.

### 2.1    Inadequate Scrutiny of Customers

174.     Defendant failed to have a consistent practice of conducting appropriate due diligence of either prospective new customers or Defendant's existing customers. New customers

were routinely on-boarded despite the acknowledged presence of unresolved red flags, Defendant failed to ensure that additional investigations were conducted when existing customers made suspicious orders, even when compliance staff flagged those orders as suspicious, blocked them, and reported them to the State.

175.   Indeed, Defendant routinely allowed Defendant's customers to make multiple suspicious orders within the same month, week, or even year, without conducting any additional due diligence of those customers. In fact, salespeople would warn customers when they were approaching their monthly threshold limits for ordering certain categories of controlled substances, putting them in a position to assist Defendant's customers in *evading* compliance reviews that would have otherwise occurred by manipulating the timing and volume of their orders.

176.   Even where customers had to be blocked from ordering opioids in excess of their monthly threshold allowance multiple times within that month, Defendant would allow those customers to resume ordering opioids the next month, at the same volume levels as before, without requiring any follow-up investigation.

177.   Defendant failed to conduct periodic, unexpected due diligence audits of McKesson's customers, even among the easily identifiable and relatively small groups of pharmacies that consistently ordered the highest volumes of opioids. Instead, these pharmacies could go for years without Defendant updating corporate knowledge of those customers' prescriber base, customer traffic patterns, and other relevant store conditions. Even when those pharmacies were scrutinized, the customer was often warned in advance.

### 3.1   Failure to Detect, Block and Report Suspicious Orders

178.   Defendant failed to report "suspicious orders," which Defendant knew were likely to be diverted, to the relevant governmental authorities.

179.    Defendant unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern, and/or orders of unusual frequency, and/or in areas from which Defendant knew opioids were likely to be diverted.

180.    Defendant breached  the prescribed duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates, and/or in areas from which Defendant knew opioids were likely to be diverted.

181.    Defendant breached  the required duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

182.    Defendant breached the required duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities of suspicious orders when discovered in violation of Defendant's duties under state law.

183.    Defendant breached prescribed duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific, and industrial channels. While the Defendant's policies nominally allowed for compliance staff to identify any order as suspicious, as a matter of practice, only orders that exceeded a customer's monthly threshold limit for a particular category of controlled substances would actually trigger a compliance review. As a result, untold numbers of opioid orders that should have been reviewed due to their unusual size or frequency, or their departure from the customers' normal ordering patterns, were never even checked to determine whether they were suspicious. Because Defendant routinely allowed Defendant's customers to obtain information about the monthly threshold limits governing their orders of opioid products, orders customers made within the limits after being enabled to "game" them were improperly excluded from compliance review, when they all should

have been checked to see whether the customers were deliberately structuring their orders to evade scrutiny.

184.    Even as to orders that exceeded customers' monthly thresholds, Defendant, over varying time periods, routinely failed to accurately identify those orders as suspicious. Instead, Defendant released those orders for delivery based on perfunctory and unverified information provided by the customer, or for no documented reason at all. Moreover, even when Defendant did identify orders as suspicious and did block them from delivery to customers, Defendant routinely failed to report those suspicious orders to the State, sometimes going months or years without reporting any at all. When Defendant did make suspicious-order reports, the reports were routinely incomplete, for example, by failing to identify all of the relevant suspicious orders for a customer, even when they were made within the same month, week, or even day.

185.    The sheer volume of prescription opioids distributed to pharmacies in various areas, and/or to pharmacies from which Defendant knew the opioids were likely to be diverted, was excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.[107]

### 4.1  Defendant Failed to Suspend Suspicious Customers

186.    Defendant failed to act to suspend customers from ordering controlled substances, let alone terminate their accounts, even after compliance staff had blocked and reported dozens, or even hundreds, of suspicious orders from those customers. In the relatively rare instances where a customer had been terminated or suspended, Defendant allowed them to reinstate their accounts,

---

[107] *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55,418-01, 55,482 (Sept. 15, 2015) (citing *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy*, Nos. 219 and 5195, 77 Fed. Reg. 62,316, 62,322 (2012)).

or open accounts under new business names, without investigating and resolving the issues that had led to the initial termination or suspension.

### 5.1  Defendant Failed to Adequately Maintain Accessible Data Concerning Customers and Prescribers

187.   Defendant failed to systematically store, organize, and make accessible for reference information about their customers or their owners, pharmacists, and top prescribers, in order to allow for meaningful future compliance efforts.

188.   Defendant failed to require compliance staff to obtain customers' prescriber information, and in some cases, changed policies to forbid such inquiries, willfully blinding Defendant to one of the most important indicators of diversion. While compliance staff and/or third-party investigators retained by Defendant would sometimes flag prescribers as suspicious in the course of conducting due diligence of a pharmacy, that information was not stored or shared in any useable format. As a result, when the same suspicious prescriber appeared among another pharmacy's top prescribers, the compliance staff handling that subsequent due diligence investigation would have no way of knowing about this risk that had already been identified, unless they had personally handled the earlier investigation, and happened to remember the prescriber's name.  Similarly, Defendant made no effort to collect and compare information about pharmacies that made high-volume orders of opioids, had been flagged for making suspicious orders, or had been suspended or terminated for suspicious or illegal practices.  As a result, compliance staff had no way of knowing that a pharmacy they were investigating shared ordering patterns or top prescribers with another risky, suspicious, and/or previously disciplined customer.

### 6.1  Defendant Failed to Report Violations to Government Authorities

189.   Defendant failed to promptly report compliance violations to the State of Alabama. Indeed, even when Defendant actually detected failures in Defendant's compliance systems,

Defendant made no effort to report those known incidents. More broadly, due to the combination of systematic failures riddling their compliance systems described above, Defendant lacked the competence to effectively detect Defendant's own violations.

190. For example, if Defendant had conducted periodic audits of Defendant's own records of customers' orders, those customers' patterns of ordering in excess of their monthly threshold allowance for opioid products, the number of times those orders were released without justification, and the number of times those orders were blocked as suspicious without being reported to government agencies and/or triggering additional investigations, suspensions, or terminations, Defendant would have been obliged to report hundreds, if not thousands, of violations at a time.

191. In short, Defendant deliberately lied to Alabama, both expressly and by omission, year in and year out, about the effectiveness of Defendant's compliance systems and the incidence of violations, so that Defendant could fraudulently maintain licenses to continue doing business in Alabama and the Tribe's community.

192. Defendant's repeated shipments of suspicious orders, over an extended period of time, in violation of Alabama public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

### 7.1 Defendant Sought to Avoid and Have Misrepresented Defendant's Compliance with Defendant's Legal Duties

193. Defendant has repeatedly misrepresented the Defendant's compliance with prescribed legal duties under Alabama state law and has wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Defendant's compliance with the required legal duties.

194.    The positions taken by the trade groups are emblematic of the position taken by the Defendant in a futile attempt to deny Defendant's legal obligations to prevent diversion of the dangerous drugs.[108]

195.    In addition to taking actions to limit regulatory prosecutions and suspensions, the Defendant and other opioid distributors undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, Defendant and other opioid distributors attempted to assure the public they were working to curb the opioid epidemic.

196.    By misleading the public about the effectiveness of Defendant's and other opioid distributors controlled substance monitoring programs, the Defendant successfully concealed the facts sufficient to arouse suspicion of the claims that the Tribe now asserts.

197.    Meanwhile, the opioid epidemic rages unabated in the United States.

198.    The distributors, including Defendant, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue.

199.    The wrongful actions and omissions of Defendant caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in the Tribe's allegations of Defendant's unlawful acts below.

200.    The Defendant routinely, and as a matter of standard operating procedure, violated the required legal obligations provided by the applicable Alabama state statute and common laws and any other laws and regulations that govern the distribution and dispensing of prescription opioids.  The allegations in this Complaint do not attempt to identify all of these actions, and the

---

[108] *See* Brief of HDMA in Support of Cardinal, *supra* n. 68, 2012 WL 1637016, at *3 (arguing the wholesale distributor industry "does not know the rules of the road because" they claim (inaccurately) that the "DEA has not adequately explained them").

information above is merely by way of example. Defendant abandoned the Defendant's duties imposed under Alabama state law, taken advantage of a lack of adequate law enforcement, and abused the privilege of distributing controlled substances.

## VI. DEFENDANT'S UNLAWFUL CONDUCT AND BREACHES OF LEGAL DUTIES CAUSED THE HARM AND SUBSTANTIAL DAMAGE ALLEGED HEREIN

201.     As the manufacturers of opioids' efforts to expand the market for opioids increased so have the rates of prescription and sale of their products – and the rates of opioid-related substance abuse, hospitalization, and death among the people of the United States, including the Tribe's citizens. Defendant continued to unlawfully ship these massive quantities of opioids.

202.     There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[109]

203.     Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[110]

204.     The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[111]

205.     The increased abuse of prescription painkillers along with growing sales has contributed to a large number of overdoses and deaths.[112]

206.     As shown above, the opioid epidemic has escalated with devastating effects: substantial opiate-related substance abuse, hospitalization, and death that goes hand in hand with Defendant's increased distribution of opioids.

---

[109] *See* Richard C. Dart et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241-248 (2015), DOI: 10.1056/NEJMsa1406143, http://www.nejm.org/doi/full/10.1056/NEJMsa1406143.
[110] *See* Volkow & McLellan*, supra* n. 61.
[111] *See* Califf et al., *supra* n. 32.
[112] *See* Prescription Painkiller Overdoses at Epidemic Levels, *supra* n. 27.

207. Because of the well-established relationship between the use of prescription opioids and the use of non-prescription opioids, like heroin, the massive distribution of opioids by Defendant caused the opioid epidemic to include heroin addiction, abuse, and death.

208. Defendant repeatedly and purposefully breached Defendant's duties under Alabama law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes and the foreseeable, inevitable financial burdens imposed on and incurred by the Tribe.

## VIII.   ADDITIONAL FACTS PERTAINING TO PUNITIVE DAMAGES

209. As set forth above, Defendant acted deliberately to increase sales of, and profits from, opioid drugs. Defendant knew that large and suspicious quantities of opioids were being poured into communities throughout the United States, including the Tribe's community. Despite this knowledge, Defendant took no steps to report suspicious orders, control the supply of opioids, or otherwise prevent diversion.  Indeed, as described above, Defendant acted to maintain  high levels of quotas for their products and to ensure that suspicious orders would not be  reported to regulators.

210. Defendant's conduct was so willful and deliberate that the conduct continued in the face of numerous enforcement actions, fines, and other warnings from state and local governments and regulatory agencies.  Defendant paid fines, made promises to do better, and continued with supply schemes. This ongoing course of conduct knowingly, deliberately, and repeatedly threatened and accomplished harm and risk of harm to public health and safety, and large-scale economic loss to the Tribe.

211. As all of the governmental actions against the Defendant's show, Defendant knew that Defendant's actions were unlawful, and yet deliberately refused to change distribution

practices because compliance with applicable legal obligations would have decreased Defendant sales and profits.

## VIII.   TOLLING AND FRAUDULENT CONCEALMENT

212.   Defendant, individually and acting through Defendant's employees and agents, knowingly and intentionally concealed material facts and knowledge from the Tribe and others to induce them to purchase and administer opioids as set forth in detail above.

213.   Defendant intended that the Tribe would rely on Defendant's misrepresentations, omissions, and concealment, knew that the Tribe would rely on Defendant's misrepresentations, and that such reliance would cause harm to the Tribe. The Tribe was duped by the Defendant's campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in Alabama, including to the Tribe.

214.   The Tribe reasonably relied on Defendant's misrepresentations and omissions in concerning opioids. The use of Defendant's opioid medicines became widespread and continuous as a result.

215.   The continued tortious and unlawful conduct by Defendant causes a repeated or continuous injury to the Tribe. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The harm is not completed, nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendant have not ceased. The nuisance created by Defendant remains unabated.

216.   The Tribe's claims are equitably tolled because Defendant knowingly and fraudulently concealed the facts and wrongful acts, and the material information pertinent to their discovery, which Defendant concealed from the Tribe. The Tribe did not know or could not have

known through the exercise of reasonable diligence, of the Tribe's claims, as a result of Defendant's conduct.

217.     Defendant continually and secretly engaged in a scheme to avoid compliance with legal obligations. Only the Defendant and Defendant's agents knew or could have known about Defendant's unlawful actions because Defendant made deliberate efforts to conceal the unlawful conduct. As a result of the above, the Tribe was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on their part.

218.     The Tribe suffered actual pecuniary damages proximately caused by Defendant's concealment of material fact, which include but are not limited to, expending funds on treatment, counseling, additional training, additional police force, and other services the Tribe would not have incurred.

219.     The Tribe has incurred expenditures for special programs over and above their ordinary budget.

220.     Defendant's misconduct alleged, in this case, does not concern a discrete event or discrete emergency of the sort a Tribe would reasonably expect to occur and is not part of the normal and expected costs of a Tribe's existence. The Tribe alleges wrongful acts which were neither discrete nor of the sort a Tribe can reasonably expect.

## IX. <u>CLAIMS FOR RELIEF</u>

### FIRST CLAIM FOR RELIEF
### NEGLIGENCE

221.     Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

222.     This claim is brought under the Alabama common law of negligence.

**1.  Defendant Owed a Duty of Care**

223.    Defendant had a duty to exercise reasonable care in the distribution of highly dangerous opioid drugs. Defendant knew or should have known that opioids were unreasonably dangerous and were likely to cause addiction. The Defendant owed duties to the Tribe because the injuries alleged herein were foreseeable by Defendant.

224.    A reasonable person could foresee the probability of occurrence of injury to Plaintiff. Reasonably prudent wholesale drug distributors of opioids would have anticipated the scourge of opioid addiction, especially when being warned and prosecuted by law enforcement repeatedly. Defendant is required to exercise a high degree of care and diligence to prevent injury to the public from the diversion of highly dangerous opioid drugs during distribution.

### 2.   Defendant Breached Defendant's Duty of Care

**Defendant's Conduct, in Violation of Applicable Statutes, Constitutes Negligence *Per Se***

225.    Defendant violated State law in failing to report suspicious orders of opioid pain medications in Alabama. Defendant violated state law, including Ala. Admin. Code r.680-X-2-.23, in failing to maintain effective controls against the diversion of opioids into other than legitimate medical channels. Defendant also violated state law, including ALA. CODE § 20-2-56, and ALA. CODE § 20-2-213, in failing to operate a system to stop orders which were flagged or should have been flagged as suspicious.

226.    A wholesaler/distributor of prescription drugs must obtain a license from Alabama Board of Pharmacy and must forward "[c]opies of records and reports required by the [DEA] concerning increases in purchases or high or unusual volumes purchased by pharmacies," Ala. Admin. Code r.680-X-2-.23 § 2(e)5, and to comply with "applicable … state and municipal laws and regulations," Ala. Admin. Code r.680-X-2-.23  § 2(k)3, among other requirements. A license shall be denied by the Board if "the granting of such a license would not be in the public interest."

Ala. Admin. Code r.680-X-2-.23 § 2(i). Defendant has a duty to comply with the law and regulations.

227.    Defendant's actions were in violation of Chapter 2 of the Alabama Uniform Controlled Substances Act ("AUCSA"), as set out above, including but not limited to ALA. CODE § 20-2-54, which forbids excessively dispensed controlled substances, and of ALA. CODE § 20-2-55, which allows suspension of any registration "without an order to show cause" by the certifying board if "there is an imminent danger to the public health or safety which warrants this action."

228.    Defendant's failure to comply with Alabama law constitutes negligence *per se*.

229.    Alabama Law requires that Defendant know the Defendant's customers, which includes an awareness of the customer base, knowledge of the average prescriptions filled each day, the percentage of controlled substances compared to overall purchases, a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes, and identification of physicians and bogus centers for the alleged treatment of pain that are the dispenser's most frequent prescribers.

230.    Defendant failed to diligently respond to suspicious orders in contravention of Alabama law.

231.    Defendant failed to provide effective controls and procedures to guard against the diversion of controlled substances in contravention of Alabama law.

232.    Defendant willfully turned a blind eye towards the actual facts by regularly distributing large quantities of controlled substances to retailers and dispensers who are serving a customer base substantially comprised of individuals who are abusing and/or diverting prescription medications, many of whom are addicted and all of whom can reasonably be expected to become addicted. Defendant negligently acted with others by dispensing controlled substances for

illegitimate medical purposes, operating bogus pain clinics that do little more than provide prescriptions for controlled substances, thereby creating and continuing addictions to prescription medications in this state.

233.     Defendant's acts and omissions, proximately caused and substantially contributed to damages to the Tribe by violating Alabama law, by creating conditions which contribute to violations of Alabama laws by others, and by Defendant's negligent and/or reckless disregard of the customs, standards, and practices within Defendant's own industry.

234.     The Tribe has suffered and will continue to suffer enormous damages as the proximate result of the failure by Defendant to comply with Alabama law.

235.     Defendant's acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties. The Tribe is within the class of persons the AUCSA was intended to protect.

236.     The harm that has occurred is the type of harm that the AUCSA was intended to guard against.

237.     Defendant's violations constitute negligence *per se*.

### 3.   Defendant Breached  Defendant's Duty of Reasonable Care

238.     **A**lternatively, to the extent that Defendant's statutory violations do not obviate the need to show breaches of the duty of care, Defendant breached its aforesaid duties of care.

<u>**Negligent Distribution**</u>

239.     Defendant distributed opioids in an improper manner by:

    a.     Distributing and selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

    b.     Distributing and selling opioids without maintaining effective controls against diversion;

    c.     Choosing not to or failing to report suspicious orders;

d.     Choosing not to or failing to stop or suspend shipments of suspicious orders; and

e.     Distributing and selling opioids prescribed by "pill mills" when opioid marketers and Defendant knew or should have known the opioids were being prescribed by "pill mills."

#### 4.   Defendant's Breaches of Care Were Intentional, Willful, Wanton and/or Reckless

240.    Defendant willfully turned a blind eye towards the actual facts by regularly distributing large quantities of controlled substances to retailers and dispensers who are serving a customer base substantially comprised of individuals who are abusing and/or diverting prescription medications, many of whom are addicted and all of whom can reasonably be expected to become addicted. Defendant acted with reckless indifference to the consequences of Defendant's acts and omissions, in that Defendant was conscious of its conduct and was aware, from Defendant's knowledge of existing circumstances and conditions, that Defendant's conduct would inevitably or probably result in injury to others, specifically the Tribe, which would be subjected to providing costs associated with diagnosis, treatment of opioid-related conditions and operation of its business in the opioid epidemic.

#### 5.   Causation and Damages

241.    As a proximate result of Defendant's conduct, Defendant caused Tribe injury related to the diagnosis and treatment of opioid-related conditions. The Tribe has incurred massive costs by providing uncompensated care as a result of opioid-related conditions.

242.    The injuries to the Tribe would not have happened in the ordinary course of events had Defendant exercised the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business in the distribution of opioids.

243.    The Tribe is entitled to recover compensatory damages as a result of Defendant's negligence, in an amount to be determined at trial.

244.    As a result of Defendant's intentional, willful, wanton and/or reckless conduct described herein, the Tribe is entitled to treble, punitive, exemplary and/or otherwise enhanced damages to the full extent available under Alabama state law, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**NUISANCE**

245.    Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

246.    This claim is brought under the Alabama common law of nuisance.

247.    The nuisance created by the Defendant is the over-saturation of opioids in the geographic area surrounding and including the Tribe for illegitimate purposes, as well as the adverse social, economic, and human health outcomes associated with widespread illegal opioid use.

248.    Defendant, individually and acting through Defendant's employees and agents, through fraudulent schemes as described herein, created and maintained the opioid epidemic in the Tribe's community, which is harmful and disruptive to and substantially and unreasonable annoys, injuriously affects, endangers, and interferes with the safety, health, morals, comfort, and general welfare of the public.

249.    Defendant's nuisance-causing activities include facilitating the sale of prescription opioids to the Tribe's citizens, as well as to unintended users, including children, people at risk of overdose or suicide, and criminals.

250.    Defendant's nuisance-causing activities also include failing to implement effective controls and procedures in Defendant's supply chains to guard against theft, diversion and misuse

of controlled substances, and Defendant's failure to adequately design and operate a system to detect, halt and report suspicious orders of controlled substances.

251.    Defendant's activities unreasonably interfere the Tribe's economic rights and the reasonable use of the Tribe's property. The Tribe's resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources that could be used to benefit the Tribe's community.

252.    Defendant's interference with these rights of the Tribe is unreasonable because it:

    a.    Has harmed and will continue to harm the public health services of and public peace of the Tribe;

    b.    Has harmed and will continue to harm the Tribal communities which the Tribe serves;

    c.    Is proscribed by statutes and regulation, including the AUCSA;

    d.    Is of a continuing nature and it has produced long-lasting effects;

    e.    Was the result of conduct that the Defendant's knew, or had reason to know, would inflict a significant effect upon the Tribe; and

    f.    Has inflicted substantial costs on the Tribe.

253.    The nuisance undermines public health, quality of life, and safety. It has resulted in high rates of addiction, overdoses, dysfunction, and despair within families and the entire Tribal community. It has created a public health crisis.

254.    Defendant's nuisance-causing activities are not outweighed by the utility of Defendant's behavior. In fact, McKesson's behavior is illegal and has no social utility whatsoever. There is no legitimately recognized societal interest in facilitating widespread opioid addiction and failing to identify, halt, and report suspicious opioid transactions.

255.    Defendant knew of the public health hazard its conduct would create. It was foreseeable to Defendant that its conduct would unreasonably interfere with the ordinary comfort, use, and enjoyment of Tribal citizens in the Tribe's community.

256.    Defendant's conduct is unreasonable, intentional, unlawful, reckless, and/or negligent.

257.    At all times, Defendant possessed the right and ability to control the nuisance causing outflow of opioids from pharmacy locations or other points of sale. Defendant had the power to shut off the supply of illicit opioids to the Tribe.

258.    As a direct and proximate result of the nuisance, the Tribe has sustained economic harm by spending a substantial amount of money trying to remedy the harms caused by Defendant's nuisance-causing activity. In short, the Defendant created a mess, leaving to the Tribe and its community the costs of cleaning it up.  This is a classic nuisance.

259.    As a result of Defendant's actions, the Tribe has suffered a special injury, different from that suffered by the public at large, by individual users and by governmental entities, namely that the Tribe has incurred additional costs combating opioid-related conditions on behalf of its citizens.

260.    The public nuisance – i.e., the opioid epidemic – created, perpetuated, and maintained by Defendant can be abated and further recurrence of such harm and inconvenience can be abated.

261.    Defendant should be required to pay the expenses the Tribe has incurred or will incur in the future to fully abate the nuisance.

262.    The acts forming the basis of the nuisance claim against the Defendant were wanton, malicious and/or attended with circumstances of aggravation.

263.    Therefore, the Tribe demands judgment in their favor against the Defendant for injunctive relief, abatement of the public nuisance, and for damages in an amount to be determined by a jury, together with all cost of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

## THIRD CLAIM FOR RELIEF
## UNJUST ENRICHMENT

264.    Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

265.    This claim is brought under the Alabama common law of unjust enrichment.

266.    The Tribe has provided services for its citizens with opioid-related conditions that Defendant is responsible for creating. The Tribe thereby conferred a benefit on Defendant because Defendant should bear the expense of treating the Tribal citizens' opioid conditions. This is because Defendant created the opioid epidemic and the Tribal citizens' opioid conditions, as described above.

267.    Defendant appreciated and knew of this benefit because Defendant knew its opioid distribution policies would cause, and in fact, have caused, the Tribe to provide services to Tribal citizens with opioid-related conditions that Defendant is responsible for creating.

268.    As an expected and intended result of Defendant's conscious wrongdoing as set forth in this Complaint, Defendant profited and benefited from the opioid epidemic.

269.    Defendant received and continue to receive the benefit of the false, deceptive, and unfair distribution of Defendant's opioid products directly to the Tribe's citizens.

270. The circumstances under which Defendant accepted or retained the benefit, described above, were such as to make it inequitable for Defendant to retain the benefit without payment of its value.

271. As described above, the benefit was received and retained under such circumstances that it would be inequitable and unconscionable to permit Defendant to avoid payment therefor.

272. Defendant, therefore, has been unjustly enriched at the expense of the Tribe.

273. By reason of the foregoing, Defendant must disgorge Defendant's unjustly acquired profits and other monetary benefits resulting from Defendant's unlawful conduct and provide restitution to the Tribe.

## FOURTH CLAIM FOR RELIEF
## FRAUD AND DECEIT

274. Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

275. This claim is brought under the Alabama common law of fraud and deceit.

276. As alleged herein, Defendant violated Defendant's duty not to actively deceive by intentionally and unlawfully making knowingly false statements, and by intentionally and unlawfully omitting and/or concealing information.

277. Defendant made misrepresentations and failed to disclose material facts to the Tribe and its citizens in order for the citizens to purchase and consume opioids as set forth herein.

278. Defendant was knowingly deceptive during the relevant period, and Defendant's deceptions were intended to induce reliance. These deceptions include but are not limited to:

  a. Acknowledgment of Defendant by and through Defendant's front group, the HDMA, that distributors are at the center of a sophisticated supply chain and therefore, are uniquely situated to

perform due diligence in order to help support the security of the controlled substances they deliver to Defendant's customers;

b.   Acknowledgment of the Defendant that because of Defendant's unique position within the "closed" system, Defendant was to act as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market;

c.   McKesson Corporation claims to have "strong programs designed to detect and prevent opioid diversion within the pharmaceutical supply chain."

d.   McKesson Corporation claims to follow strict procedures such as an "experienced Controlled Substance Monitoring Program team", conducts "thorough customer due diligence and ongoing oversight", performing "regular ARCOS reporting", providing "regular customer education", conducting "ongoing state collaboration efforts", and tightly controlling "physical supply chain."

e.   More holistically, Defendant misrepresented that not only do the Defendant have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs but undertake such efforts as responsible members of society; and

f.   Such other omissions or concealments as described above in this Complaint.

279.   By engaging in the acts and practices alleged herein, Defendant, in the relevant time period and with the intent that others rely on their omissions or suppression of information, omitted material facts that Defendant had a duty to disclose by virtue of the Defendant's other representations, including but not limited to:

a.   There being no legitimate medical purpose for the copious amounts of opioids shipped around the Tribe's communities;

b.   That Defendant failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical scientific and industrial channels by sales to certain customers;

c.   That Defendant failed to prevent against diversion from legitimate to non-legitimate channels;

d.   That Defendant failed to conduct meaningful due diligence to ensure that controlled substances were not diverted into other than legitimate channels;

e.   That Defendant failed to keep and maintain accurate records of Schedule II – V controlled substances; and

f.   Such other omissions or concealments as alleged above in this Complaint.

280.   Defendant intended and had reason to expect under the operative circumstances that the Tribe and its citizens would be deceived by Defendant's statements, concealments, and conduct as alleged herein and that the Tribe would act or fail to act in reasonable reliance thereon.

281.   Defendant intended that the Tribe and its citizens would rely on the Defendant's misrepresentations and omissions; Defendant intended and knew that this reasonable and rightful reliance would be induced by Defendant's misrepresentations and omissions; and, Defendant intended and knew that such reliance would cause the Tribe to suffer loss.

282.   The Tribe rightfully, reasonably, and justifiably relied on Defendant's representations and/or concealments, both directly and indirectly. As Defendant knew or should have known, the Tribe and its citizens were directly and proximately injured as a result of this reliance, the Tribe's injuries were directly and proximately caused by this reliance.

283.   As a result of these representations and/or omissions, the Tribe proceeded under the misapprehension that the opioid crisis was simply a result of conduct by persons other than Defendant. As a consequence, the Defendant prevented the Tribe from a timelier and more effective response to the opioid epidemic.

284.   Defendant's false representations and omissions were material and were made and omitted intentionally and recklessly.

285.   Defendant's misconduct alleged, in this case, is ongoing and persistent.

286.     Defendant's misconduct alleged, in this case, does not concern a discrete event or discrete emergency of the sort the Tribe would reasonably expect to occur and is not part of the normal and expected costs of a Tribe. The Tribe alleges wrongful acts which are neither discrete nor of the sort a Tribe can reasonably expect.

287.     The Tribe has incurred expenditures for special programs over and above that which is customary for the Tribe.

288.     Defendant's conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by Defendant's acts and omissions.

289.     Defendant acted with actual malice because Defendant acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

290.     The Tribe has suffered monetary damages as aforesaid. As such, the Tribe seeks all legal and equitable relief as allowed by Alabama state law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendant, as well as attorney fees, and costs, and pre- and post-judgment interest.

## FIFTH CLAIM FOR RELIEF
## WANTONNESS

291.     Plaintiff repeats, realleges, and incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein.

292.     This cause of action is brought under Alabama common law relating to wantonness.

293.     The actions and failure to act of the Defendant enumerated in this complaint were made consciously and with reckless disregard of the rights and safety of others and Defendant was aware that harm would likely or probably result from Defendant's actions or failure to act.

294.    As a direct and proximate result of Defendant's wantonness, the Tribe has suffered and continues to suffer injury-in-fact and actual damages.

295.    As a proximate result of Defendant's wantonness, Defendant caused the Tribe's injury related to the treatment of opioid-related conditions. The Tribe has incurred massive costs by providing uncompensated care as a result of opioid-related conditions.

296.    As a result of the Defendant's wantonness, the Tribe is entitled to compensatory and punitive damages, in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
## ALABAMA DECEPTIVE TRADE PRACTICES ACT

297.    Plaintiff realleges and incorporates by reference all paragraphs above.

298.    Defendant violated the Alabama Deceptive Trade Practices Act, ALA. CODE § 18-19-1, et seq. ("ADTPA") by engaging in unfair and deceptive acts or practices and/or unconscionable consumer sales acts and practices in this state.

299.    This Cause of Action is brought in the public interest under the ADTPA and seeks a declaratory judgment that Defendant violated the ADTPA, an injunction enjoining Defendant's misrepresentations and other misconduct described in this Complaint, restitution to the Tribe, and civil penalties, and restitution to the Tribe. The ADTPA prohibits, in connection with consumer transactions, unfair, deceptive or unconscionable consumer sales practices that mislead consumers about the nature of the product they are receiving. The ADTPA prohibits sellers from representing that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have.

300.    The following acts are deemed to be deceptive under Alabama law:

i.      Making any express or implied statement in connection with the marketing or advertisement of any product that is false, or has the capacity, tendency or effect of deceiving or misleading consumers; or omitting any material

information such that the express or implied statement deceives or tends to deceive consumers.

ii.    Making any representation, in connection with the marketing or advertising of a product, about research that has been performed, including but not limited to, any representation that a product has been clinically tested unless at the time the claim is made, competent and reliable scientific evidence exists substantiating such claim.

iii.    Making in connection with the marketing or advertising of a product any . . . statements or representations concerning a product that materially contradict or conflict with any other statements or representations the Defendant made about such Product and rend such statements or representations misleading and/or deceptive.

iv.    Making, or causing to be made, any written or oral claim that is false, misleading or deceptive.

v.    Representing that any product has any sponsorship, approval, characteristics, ingredients, uses, benefits, quantities, or qualities that it does not have.

vi.    Representing that any product has any sponsorship, characteristics, ingredients, uses, benefits, quantities, or qualities that it does not have.

vii.    Making in a promotional context an express or implied representation that a product is better, more effective, useful in a broader range of conditions or patients, safer, has fewer, or less incidence of, or less serious side effects or contraindications than has been demonstrated by competent and reliable scientific evidence, whether or not such express or implied representation is made by comparison with another drug or treatment, and whether or not such a representation or suggestion is made directly or through use of published or unpublished literature, a quotation, or another reference.

301.    As alleged herein, Defendant, at all times relevant to this Complaint, violated the ADTPA by making deceptive representations about the use of opioids. Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. Defendant's omissions rendered even Defendant's seemingly truthful statements about opioids deceptive.

302.    The Tribe has suffered monetary damages as aforesaid.  As such, the Tribe seeks all legal and equitable relief as allowed by Alabama state law, including *inter alia* injunctive relief,

restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendant, as well as attorneys' fees, costs, and pre-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks that the Court:

A.    Enter judgment against Defendant and in favor of Plaintiff;

B.    Award compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages; punitive damages; pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate; and such equitable relief against Defendant as the Court should find appropriate, including disgorgement of illicit proceeds, injunctive relief, abatement and other orders;

C.    Award Plaintiff their costs of suit; including reasonable attorneys' fees as provided by law;

D.    Award such further and additional relief as the Court may deem just and proper under the circumstances.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 5, 2020

Respectfully Submitted,


*/s/ T. Roe Frazer II*
T. Roe Frazer II (6624-R42T)
Patrick D. McMurtray (3387-M37P)
FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
(615) 647-6464
roe@frazer.law
patrick@frazer.law


*To be Admitted Pro Hac Vice:*

Thomas Roe Frazer III
W. Matthew Pettit

FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
(615) 647-6464
trey@frazer.law
mpettit@frazer.law

Archie Lamb
LEVIN PAPANTONIO
THOMAS MITCHELL RAFFERTY PROCTOR P.A.
316 South Baylen St.
Pensacola, FL 32502
(850) 435-7000
alamb@levinlaw.com

J. Nixon Daniel, III
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
(850) 432-2451
jnd@beggslane.com

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP
2013 1st Avenue North, Ste 450
Birmingham, Alabama  35203
(205) 252-6127
ftk@thekuykendallgroup.com



AlaFile E-Notice

02-CV-2020-901671.00

To:  THOMAS ROE FRAZER II
     ROE@FRAZER.LAW

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION
02-CV-2020-901671.00

The following complaint was FILED on 8/5/2020 4:06:14 PM

Notice Date:     8/5/2020 4:06:14 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-901671.00

To:  MCKESSON CORPORATION
     641 SOUTH LAWRENCE STREET
     MONTGOMERY, AL, 36104

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION
02-CV-2020-901671.00

The following complaint was FILED on 8/5/2020 4:06:14 PM

Notice Date:      8/5/2020 4:06:14 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>02-CV-2020-901671.00 |
|---|---|---|

**IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA**
**POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION**

**NOTICE TO:** MCKESSON CORPORATION, 641 SOUTH LAWRENCE STREET, MONTGOMERY, AL 36104
_____
*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), THOMAS ROE FRAZER II
_____ ,
*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: 30 BURTON HILLS BLVD., SUITE 450, NASHVILLE, TN 37215 .
*[Address(es) of Plaintiff(s) or Attorney(s)]*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

**TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:**

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of POARCH BAND OF CREEK INDIANS
pursuant to the Alabama Rules of the Civil Procedure.                              *[Name(s)]*

| 08/05/2020 | /s/ JOJO SCHWARZAUER | By: _____ |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.          /s/ THOMAS ROE FRAZER II
_____
*(Plaintiff's/Attorney's Signature)*

## RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____ .
*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____
_____ in _____ County,
*(Name of Person Served)*                              *(Name of County)*

Alabama on _____ .
*(Date)*

_____     _____     _____
*(Type of Process Server)*              *(Server's Signature)*                    *(Address of Server)*

                                        _____     _____
                                        *(Server's Printed Name)*                *(Phone Number of Server)*

ELECTRONICALLY FILED
8/10/2020 10:59 AM
02-CV-2020-901671.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | |
|---|---|
| OF CREEK INDIANS POARCH BAND, | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) Case No.:    CV-2020-901671.00 |
| | ) |
| MCKESSON CORPORATION, | ) |
| Defendant. | ) |

## ORDER

## PRETRIAL ORDER: JURY AND NON-JURY CASES
## IN THE CIRCUIT COURT OF MOBILE COUNTY
## BEFORE JUDGE JILL P. PHILLIPS

In all pending cases before Judge Phillips, the following Pretrial Order will apply. This Order is in addition to the Fast Track Order or General Pretrial Order that may be filed with this case. To the extent this Pretrial Order conflicts with the Fast Track or the General Order, this Pretrial Order is the governing Order.

Fast Track Order:

1. If any party objects to inclusion in the Fast Track System, the Court requires the party to file a Motion to Exclude along with a Proposed Scheduling Order. (See ¶ 9 below). At a minimum, the Proposed Scheduling Order must provide a proposed trial date (or month), the length of the trial, dispositive motion cut-off dates (see ¶ 5 below), factual discovery cut-off dates, expert discovery cut-off dates, and any limitations on discovery or exhibits. If the parties cannot agree on a Scheduling Order, the Court will conduct a Rule 16 conference to finalize one.

2. If case remains in the Fast Track system, the Court expects the parties to comply with the time constraints set forth in that Order. Once a party files a Motion to Set the Matter for Trial and a Certificate of Readiness, the Court will grant the motion, subject to any objection, and assign the case to a mediator to be mediated within 60 days. If the mediation is unsuccessful, the parties are required to file a report and the Court will assign a trial date.

3. If the parties anticipate that preparing for trial will take more than eighteen months, the parties must file a motion for a Rule 16 conference.

All Jury Trial Cases:

4. **If at any time while the action is pending either party anticipates that the**

**jury trial will take more than 5 days, that party must file a motion for a Rule 16 conference.**

5.      The Court requires any dispositive motion to be filed at least 60 days before trial. Any dispositive motion filed after this deadline will not be considered before trial.  THE PARTIES MAY NOT DEVIATE BY AGREEMENT FROM THIS RULE THIS WITHOUT EXPRESSLY SEEKING AND RECEIVING THE COURT'S PERMISSION.

6.      The Court will conduct a Pretrial Conference approximately ten days prior to the trial setting.   The attorney(s) who will be trying the case must attend the Pretrial Conference.   The Court will issue a pretrial order after the conference addressing exchange of pre-marked exhibits, witness lists, jury charges, deposition testimony use and other procedural trial issues.

7.      All Motions to Strike and Motions in Limine must be filed at least 14 days before the start of trial.  The Court will set these motions for a hearing prior to the first day of trial.  The Court will not hear any motions filed after this deadline unless for good cause shown.

All Cases:

8.      All pleadings and evidentiary support must be e-filed.  The Court will not accept paper-filed pleadings unless the Court has given counsel prior written permission.

9.      Motions must be accompanied with a proposed order **filed as a proposed order**.  The Court cautions the attorneys that when e-filing proposed orders, the proposed order cannot be filed within the body of the motion or as an "attachment" or an "exhibit" to the pending motion.  It must be filed as a "proposed order."  If the attorneys experience difficulty with this, see User Manual at www.alacourt.gov/pdfppt/alafileUserManual.pdf.

10.      Motions for service by publication must be properly supported by an affidavit setting forth the facts averring avoidance of service.  See Fisher v. Amaraneni, 565 So. 2d 84 (Ala. 1990); Wagner v. White, 985 So. 2d 458 (Ala. Civ. App. 2007).

11.      Prior to requesting a continuance for a motion or trial setting, the requesting party must confer with opposing counsel and indicate the result of the conference in the Motion to Continue.

12.      Counsel must confer the night before or the morning of a scheduled hearing on any discovery dispute and attempt to resolve the discovery dispute or narrow down the disputed issues.  As a general rule, this Court highly disfavors unsupported "boilerplate" objections such as the request is irrelevant, vague, ambiguous, overly broad, unduly burdensome, or unlikely to lead to the discovery of admissible evidence.  Objections to a discovery request must be specific and supported by detailed explanation of why the discovery request is improper.   Ex Parte Dorsey Trailers Inc., 397 So. 2d 98 (Ala. 1981).    Further, answering a discovery request subject to or reserving a general objection will be deemed a waiver of that objection. See Wright, Miller & Marcus, Fed Prac & Proc, Civil §2173 ("A voluntary answer to an interrogatory is also a waiver of the

objection.").

13.     Protective Orders containing provisions to seal court records and motions to seal court filings must be set for a hearing during which the party requesting to seal the records must provide clear and convincing evidence that the documents should be sealed.  See Holland v. EADS, 614 So. 2d 1012 (Ala 1993).

14.     The Court may request the parties e-mail proposed orders on certain issues directly to the Court. Any proposed orders sent to the Court through e-mail must be attached as a ".doc" in Microsoft Word format and counsel for opposing parties must copied on the e-mail.

15.     Only documents filed as a "motion" appear in the Court's motion queue for review because of the nature of the Alacourt system. Documents filed as "other," "miscellaneous," "discovery," or "amended complaint/answer"  (such as stipulations of dismissal, notice of removal, etc.) will appear in the case action summary sheet, but the Court has no notice that such a document has been filed.  If Court action is required in conjunction any pleadings, it needs to be filed as a "motion."

Additional Rules Applicable to Workers Compensation Cases:

1.     The parties must notify the Court when the plaintiff is at Maximum Medical Improvement.  All cases will be mediated prior to trial on the merits and then set for trial within 90 days of notification of an unsuccessful mediation.

2.     Motions to Compel filed where liability is disputed will be treated as a Request for Trial on the merits on liability only.

3.     At the close of evidence in any case, the Court will request the parties submit through e-mail proposed Findings of Fact and Conclusions of Law to the Court. (See ¶ 14 above).

Additional Rules Applicable to Non-Jury Account Collection, Contract, Ejectment, and "Other" Similar Cases:

1.     Service shall be perfected within 120 days or the case will be dismissed. Motions to Extend the Time for Service must be accompanied by an affidavit about service attempts and a proposed order.  See ¶ 9 above.  Motion for service by publication must be properly supported.  See ¶ 10 above.

2.     Once the Defendant(s) is served and fails to answer, the Court expects dispositive motions to be filed within 90 days of service.  Motions for default must be supported appropriately and a proposed order filed.  See ¶ 9 above.  See Thomas v. American Express Bank, FSB, 139 So. 3d 809 (Ala. Civ. App. 2013).

3.     Once the Defendant(s) is served and answers, the Court expects either a dispositive motion such as summary judgment or a request to set the case for trial within 90 days of the answer.

**PROVISIONS IN ANY PROPOSED SCHEDULING ORDERS THAT DEVIATE IN ANY WAY FROM THIS ORDER, JOINTLY AGREED TO OR OTHERWISE, MUST BE BROUGHT TO THE COURT'S ATTENTION BY VIRTUE OF A PLEADING REQUESTING PERMISSION TO DEVIATE FROM THIS ORDER.**

**DONE this 10th day of August, 2020.**

**/s/ JILL PARRISH PHILLIPS**
**CIRCUIT JUDGE**



AlaFile E-Notice

02-CV-2020-901671.00

Judge: JILL PARRISH PHILLIPS

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION
02-CV-2020-901671.00

The following matter was FILED on 8/10/2020 10:59:06 AM

Notice Date:     8/10/2020 10:59:06 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-901671.00

Judge: JILL PARRISH PHILLIPS

To:  MCKESSON CORPORATION (PRO SE)
     641 SOUTH LAWRENCE STREET
     MONTGOMERY, AL, 36104-0000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION
02-CV-2020-901671.00

The following matter was FILED on 8/10/2020 10:59:06 AM

Notice Date:     8/10/2020 10:59:06 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



# SENDER: COMPLETE THIS SECTION

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

McKesson Corporation
641 South Lawrence St
Montgomery AL 36104

9590 9402 5424 9189 9873 61

2. Article Number *(Transfer from service label)*

7019 2280 0000 6129 0087

## COMPLETE THIS SECTION ON DELIVERY

A. Signature

X ☒ Agent
☐ Addressee

B. Received by *(Printed Name)*
C. Date of Delivery
8-10-20

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053       Domestic Return Receipt

**United States Postal Service**

USPS TRACKING #

9590 9402 5424 9189 9873 61

FILED
1010 SCHWARZAUER, CLERK
AUG 13 2020
Circuit Court

• Sender: Please print your name, address, and ZIP+4® in this box•

Circuit Court Clerk
Suite 5
Government Street
Suite 936
Mobile AL 36644

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

Roach Board [illegible] Corp.
[illegible] 02-CV-2020-901671.00 Filed on 8/5/2020 Circuit/Civil



AlaFile E-Notice

02-CV-2020-901671.00

Judge: JILL PARRISH PHILLIPS

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION
02-CV-2020-901671.00

The following matter was served on 8/10/2020

D001 MCKESSON CORPORATION
Corresponding To
CERTIFIED MAIL

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

ELECTRONICALLY FILED
9/9/2020 4:22 PM
02-CV-2020-901671.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

**STATE OF ALABAMA**  Revised 3/5/08  Cas...

Unified Judicial System

02-MOBILE  ☐ District Court  ☑ Circuit Court  CV2...

POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION

# CIVIL MOTION COVER SHEET

*Name of Filing Party:* D001 - MCKESSON CORPORATION

*Name, Address, and Telephone No. of Attorney or Party. If Not Represented.*

HARLAN IRBY PRATER IV

400 20TH STREET NORTH

BIRMINGHAM, AL 35203

*Attorney Bar No.:* PRA004

☐ Oral Arguments Requested

## TYPE OF MOTION

| Motions Requiring Fee | Motions Not Requiring Fee |
|---|---|
| ☐ Default Judgment ($50.00) | ☐ Add Party |
| ☐ Joinder in Other Party's Dispositive Motion (i.e. Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Amend |
| | ☐ Change of Venue/Transfer |
| | ☐ Compel |
| ☐ Judgment on the Pleadings ($50.00) | ☐ Consolidation |
| ☐ Motion to Dismiss, or in the Alternative Summary Judgment ($50.00) | ☐ Continue |
| | ☐ Deposition |
| ☐ Renewed Dispositive Motion (Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Designate a Mediator |
| | ☐ Judgment as a Matter of Law (during Trial) |
| ☐ Summary Judgment pursuant to Rule 56 ($50.00) | ☐ Disburse Funds |
| ☐ Motion to Intervene ($297.00) | ☑ Extension of Time |
| ☐ Other _____ | ☐ In Limine |
| pursuant to Rule _____ ($50.00) | ☐ Joinder |
| | ☐ More Definite Statement |
| *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees. | ☐ Motion to Dismiss pursuant to Rule 12(b) |
| | ☐ New Trial |
| ☐ Local Court Costs $ 0 | ☐ Objection of Exemptions Claimed |
| | ☐ Pendente Lite |
| | ☐ Plaintiff's Motion to Dismiss |
| | ☐ Preliminary Injunction |
| | ☐ Protective Order |
| | ☐ Quash |
| | ☐ Release from Stay of Execution |
| | ☐ Sanctions |
| | ☐ Sever |
| | ☐ Special Practice in Alabama |
| | ☐ Stay |
| | ☐ Strike |
| | ☐ Supplement to Pending Motion |
| | ☐ Vacate or Modify |
| | ☐ Withdraw |
| | ☐ Other _____ |
| | pursuant to Rule _____ (Subject to Filing Fee) |

Check here if you have filed or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees) ☐

Date:
9/3/2020 4:20:05 PM

Signature of Attorney or Party
/s/ HARLAN IRBY PRATER IV

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

DOCUMENT 10

ELECTRONICALLY FILED
9/9/2020 4:22 PM
02-CV-2020-901671.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

### IN THE CIRCUIT COURT
### OF MOBILE COUNTY, ALABAMA

| | | |
|---|---|---|
| POARCH BAND OF CREEK INDIANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | CV-2020-901671.00 |
| MCKESSON CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

### MOTION FOR EXTENSION

Defendant McKesson Corporation hereby moves to extend the deadline to answer or otherwise respond to Plaintiff's Complaint in the above matter until October 26, 2020.[1]  Plaintiff consents to the entry of the Order attached as Exhibit A confirming this extension.

September 3, 2020                          Respectfully submitted,

                                          */s/ Harlan I. Prater, IV*
                                          Harlan I. Prater, IV
                                          *Attorney for Defendant McKesson Corporation*

**OF COUNSEL**
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 320th Street North
Birmingham, AL 35203-3200

---

[1] McKesson Corporation does not waive any right, defense, affirmative defense, or objection to lack of personal jurisdiction and/or improper venue.

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on the 3rd day of September 2020, I filed the foregoing documents with the Clerk of Court which will serve all counsel of record by electronic mail.


              <u>*/s/ Harlan I. Prater, IV*</u>
              Of Counsel

ELECTRONICALLY FILED
9/9/2020 4:22 PM
02-CV-2020-901671.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

# EXHIBIT A

**IN THE CIRCUIT COURT
OF MOBILE COUNTY, ALABAMA**

| | | |
|---|---|---|
| POARCH BAND OF CREEK INDIANS, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | CV-2020-901671.00 |
| MCKESSON CORPORATION, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |
| | ) | |

**<u>ORDER GRANTING DEFENDANT'S MOTION FOR EXTENSION</u>**

Defendant McKesson Corporation moved to extend the deadline to answer or otherwise respond to the Plaintiff's Complaint to October 26, 2020.

The Court hereby GRANTS the Motion and extends the date for Defendant McKesson Corporation to answer or otherwise respond to the Plaintiff's Complaint until October 26, 2020.

DONE and ORDERED this the _____ day of _____, 2020

_____
CIRCUIT COURT JUDGE

ELECTRONICALLY FILED
9/9/2020 4:22 PM
02-CV-2020-901671.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

# IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

|                                     |     |            |                   |
|-------------------------------------|-----|------------|-------------------|
| OF CREEK INDIANS POARCH BAND,       | )   |            |                   |
| Plaintiff,                          | )   |            |                   |
|                                     | )   |            |                   |
| V.                                  | )   | Case No.:  | CV-2020-901671.00 |
|                                     | )   |            |                   |
| MCKESSON CORPORATION,               | )   |            |                   |
| Defendant.                          | )   |            |                   |

### Order Granting Defendant's Motion for Extension

Defendant McKesson Corporation moved to extend the deadline to answer or otherwise respond to the Plaintiff's Complaint to October 26, 2020.

The Court hereby GRANTS the Motion and extends the date for Defendant McKesson Corporation to answer or otherwise respond to the Plaintiff's Complaint until October 26, 2020.

**DONE this[To be filled by the Judge].**

**/s/[To be filled by the Judge]**
**CIRCUIT JUDGE**



AlaFile E-Notice

02-CV-2020-901671.00

Judge: JILL PARRISH PHILLIPS

To:   HARLAN IRBY PRATER IV
      hprater@lfwlaw.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION
02-CV-2020-901671.00

The following matter was FILED on 9/3/2020 4:22:15 PM

D001 MCKESSON CORPORATION
MOTION FOR EXTENSION OF TIME
[Filer: PRATER HARLAN IRBY IV]

Notice Date:      9/3/2020 4:22:15 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-901671.00

Judge: JILL PARRISH PHILLIPS

To:  MCKESSON CORPORATION (PRO SE)
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104-0000

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION
02-CV-2020-901671.00

The following matter was FILED on 9/3/2020 4:22:15 PM

D001 MCKESSON CORPORATION
MOTION FOR EXTENSION OF TIME
[Filer: PRATER HARLAN IRBY IV]

Notice Date:     9/3/2020 4:22:15 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-901671.00

Judge: JILL PARRISH PHILLIPS

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION
02-CV-2020-901671.00

The following matter was FILED on 9/3/2020 4:22:15 PM

D001 MCKESSON CORPORATION
MOTION FOR EXTENSION OF TIME
[Filer: PRATER HARLAN IRBY IV]

Notice Date:     9/3/2020 4:22:15 PM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov

ELECTRONICALLY FILED
9/4/2020 9:50 AM
02-CV-2020-901671.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
JOJO SCHWARZAUER, CLERK

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | |
|---|---|
| OF CREEK INDIANS POARCH BAND,) | |
| Plaintiff, ) | |
| ) | |
| V. ) | Case No.:    CV-2020-901671.00 |
| ) | |
| MCKESSON CORPORATION, ) | |
| Defendant. ) | |

### Order Granting Defendant's Motion for Extension

Defendant McKesson Corporation moved to extend the deadline to answer or otherwise respond to the Plaintiff's Complaint to October 26, 2020.

The Court hereby GRANTS the Motion and extends the date for Defendant McKesson Corporation to answer or otherwise respond to the Plaintiff's Complaint until October 26, 2020.

**DONE this 4ᵗʰ day of September, 2020.**

/s/ JILL PARRISH PHILLIPS
**CIRCUIT JUDGE**



AlaFile E-Notice

02-CV-2020-901671.00

Judge: JILL PARRISH PHILLIPS

To:  FRAZER THOMAS ROE II
     ROE@FRAZER.LAW

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION
02-CV-2020-901671.00

A court action was entered in the above case on 9/4/2020 9:50:18 AM

ORDER

[Filer: ]

Disposition:    GRANTED
Judge:          JPP

Notice Date:    9/4/2020 9:50:18 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov



AlaFile E-Notice

02-CV-2020-901671.00

Judge: JILL PARRISH PHILLIPS

To:  PRATER HARLAN IRBY IV
     hprater@lfwlaw.com

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

POARCH BAND OF CREEK INDIANS V. MCKESSON CORPORATION
02-CV-2020-901671.00

A court action was entered in the above case on 9/4/2020 9:50:18 AM

ORDER

[Filer: ]

Disposition:    GRANTED
Judge:          JPP

Notice Date:    9/4/2020 9:50:18 AM

JOJO SCHWARZAUER
CIRCUIT COURT CLERK
MOBILE COUNTY, ALABAMA
CIRCUIT CIVIL DIVISION
205 GOVERNMENT STREET
MOBILE, AL, 36644

251-574-8420
charles.lewis@alacourt.gov